THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID N. LAMBERT, Defendant-Appellant.

Fourth District  No. 4—89—0358

Opinion filed March 15, 1990.

316

Kevin P. Fitzgerald, of Thomson & Weintraub, of Bloomington, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and Nathan P. Maddox, Assistant Attorneys General, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:
After a jury trial, defendant was convicted of various counts of

theft by deception and criminal breach of fiduciary duty. The trial court sentenced defendant to an eight-year extended term on each theft by deception conviction. No sentence was imposed on the criminal breach of fiduciary duty counts upon a finding they merged with the theft by deception convictions. Defendant appeals his convictions and sentence.

Defendant was originally charged by indictment with 31 separate counts of theft by deception, criminal breach of fiduciary duty, and unlicensed insurance production. (Ill. Rev. Stat. 1987, ch. 38, par. 16—1(b)(1); Ill. Rev. Stat. 1987, ch. 73, pars. 1065.55—1, 1065.39—2(c).) All counts related to certain checks defendant received from several individuals.

Prior to trial, one count was severed and 10 others were dismissed on motion of the State. Of the remaining 20 counts which went to the jury, 16 involved 8 transactions between defendant and Lois A. Bradley. As to each transaction defendant was charged, alternatively, with one count of theft by deception and one count of criminal breach of fiduciary duty. The final four counts charged theft by deception as to four additional transactions involving Hilda Fehr and Alphonse and Dorothy Boucher.

The jury returned guilty verdicts on 18 of the 20 counts, acquitting defendant on both counts related to one of the transactions involving Lois A. Bradley. At sentencing, at the State's suggestion, the court found defendant's convictions from criminal breach of fiduciary duty merged with the convictions for theft by deception. Thereafter, the court imposed an eight-year extended-term sentence on each of the 11 convictions for theft by deception, with each sentence to be served concurrently. The court further ordered restitution of $57,919.20, less any amount shown to have been repaid.

### I. MOTION TO DISMISS FOR IMPROPER VENUE

Prior to trial, defendant filed a motion to dismiss for improper venue in McLean County. That motion was directed to all 14 counts which charged him with criminal breach of fiduciary duty and unlicensed insurance production. Five counts relating to unlicensed insurance production were dismissed on motion of the State and the sixth count was severed. The court denied defendant's motion to dismiss the remaining eight counts of criminal breach of fiduciary duty. Defendant was convicted of seven of those counts.

On appeal, defendant argues that the trial court erred in denying his motion to dismiss for improper venue, maintaining that because he received the checks in question from Lois A. Bradley in Piatt County,

Illinois, venue for those offenses did not lie in McLean County, Illinois. The State argues that venue was proper in McLean County.

■ Section 508.1 of the Illinois Insurance Code states in pertinent part:

"Any money which an insurance producer *** receives for soliciting, negotiating, effecting, procuring, renewing, continuing or binding policies of insurance shall be held in a fiduciary capacity, and shall not be misappropriated, converted or improperly withheld.

* * *

*** When an insurance producer *** knowingly misappropriates or converts to his own use or illegally withholds premiums in excess of $150, he is guilty of a Class 3 felony." (Ill. Rev. Stat. 1987, ch. 73, par. 1065.55—1.)

Thus, under this statute, a defendant is guilty of criminal breach of fiduciary duty when he knowingly misappropriates or converts to his own use or illegally withholds fiduciary monies.

■ "Conversion" is defined as "[t]he unauthorized exercise of dominion or control over someone's personal property." West's Legal Thesaurus/Dictionary 186 (1986).

Section 1—6(a) of the Criminal Code of 1961 states:

"Criminal actions shall be tried in the county where the offense was committed." Ill. Rev. Stat. 1987, ch. 38, par. 1—6(a). .

■ In the present case, defendant was specifically charged with knowingly converting to his own use fiduciary monies represented by the various checks in question. Extensive evidence presented at trial showed that the conversion of the fiduciary monies took place upon defendant's depositing the checks into a checking account at Champion Federal Savings and Loan in Bloomington, Illinois, located in McLean County, Illinois, and upon defendant's writing checks from that account to himself and to cash. Venue is proper in any county where *any* element of the offense being tried was committed. (See *People v. Brown* (1982), 107 Ill. App. 3d 742, 744, 438 N.E.2d 250, 252.) Because an element of the offense of criminal breach of fiduciary duty was committed in McLean County, venue was proper in that county.

## II. DEFENDANT'S CONVICTIONS FOR CRIMINAL BREACH OF FIDUCIARY DUTY

For each of the seven checks issued by Lois A. Bradley, defendant was charged with both theft by deception and criminal breach of fiduciary duty. Defendant argues it was improper for the trial court to convict him of more than one offense relative to each check because

each taking of a check constituted a single act. In support of his argument, defendant cites *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, and *People v. Kaye* (1987), 154 Ill. App. 3d 562, 507 N.E.2d 12. Under *King* and *Kaye*, defendant maintains each count alleging criminal breach of fiduciary duty set forth the same physical act and transaction alleged in the corresponding count of theft by deception and, therefore, both convictions cannot stand. Because defendant was acquitted of two charges involving one of the Bradley transactions, defendant's argument is irrelevant insofar as those counts are concerned.

■ The Illinois Supreme Court held in *King* that when the same physical act of the accused constitutes two or more offenses, it is proper to enter judgment of conviction and sentence only on the most serious offense. In its opinion, the court stated:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." *King*, 66 Ill. 2d at 566, 363 N.E.2d at 844-45.

In *Kaye*, the court found three out of six bribery charges to be predicated on a different physical act—the solicitation of money rather than the receipt of money—from the theft by deception charge which involved the receipt of money. In affirming the defendant's conviction for these counts, the court distinguished the charges and found the act of soliciting to precede the act of receiving. *Kaye*, 154 Ill. App. 3d at 573, 507 N.E.2d at 19.

■ Based upon the foregoing analysis, a comparison of requisite elements of theft by deception and criminal breach of fiduciary duty is necessary. A person commits theft by deception when he knowingly obtains by deception control over property of the owner and intends to deprive the owner permanently of the use of benefit of the property. (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 16—1(a)(2)(A); *Kaye*, 154

Ill. App. 3d at 571, 507 N.E.2d at 18,) A person commits criminal breach of fiduciary duty when he knowingly misappropriates or converts to his own use or illegally withholds fiduciary monies. Ill. Rev. Stat. 1987, ch. 73, par. 1065.55—1.

■ In the present case, theft by deception and criminal breach of fiduciary duty were predicated on separate criminal acts, and each of these charges is supported by the record. First, the act of conversion of fiduciary monies is distinguishable from the act of receiving another's property by deception. Second, neither of the crimes is an included offense of the other. And third, the trial court specifically held in its judgment and sentence order that the criminal breach of fiduciary duty convictions were merged with the theft by deception convictions. As the court stated in *King*, "when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." *King*, 66 Ill. 2d at 566, 363 N.E.2d at 845.

### III. SUFFICIENCY OF THE EVIDENCE

Defendant next contends that the evidence is insufficient to prove him guilty beyond a reasonable doubt. In support of his argument, defendant argues that every reasonable hypothesis of his innocence must be excluded to sustain a conviction. *People v. Evans* (1981), 87 Ill. 2d 77, 83, 429 N.E.2d 520, 522-23.

Recently, however, in *People v. Eyler* (1989), 133 Ill. 2d 173, 191, the Illinois Supreme Court set forth the standards governing review of the sufficiency of the evidence:

"[W]e have disapproved of the use of the 'reasonable hypothesis of innocence' language in jury instructions, because it is both 'obscure and misleading.' *People v. Bryant* (1986), 113 Ill. 2d 497, 512.

The principles governing our review of defendant's challenge to the sufficiency of the evidence are well established and were recently set forth in *People v. Phillips* (1989), 127 Ill. 2d 499, 509-10. It is, of course, the jury's function to determine the accused's guilt or innocence and this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt. It is not this court's function to retry the defendant. The United States Supreme Court has stated that 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential el-

ements of the crime beyond a reasonable doubt.' (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; see also *People v. Collins* (1985), 106 Ill. 2d 237, 261.) Moreover, it is for the jury to weigh the credibility of witnesses and to resolve conflicts or inconsistencies in their testimony. (*Phillips*, 127 Ill. 2d at 514.)"
Accord *People v. Pintos* (1989), 133 Ill. 2d 286, 291.

These are the principles of which we are mindful as we review the sufficiency of the evidence with regard to each particular charge.

### A. THE CHARGE INVOLVING ALPHONSE AND DOROTHY BOUCHER

Defendant was charged with one count of theft by deception of Alphonse and Dorothy Boucher. The charge concerned a check for $10,000 drawn on the Bouchers' money market account on February 5, 1987.

Mrs. Boucher testified that she and her husband were retired farmers and that her husband was 82 years old. She also testified that she and her husband purchased various Amway products from defendant and that once she purchased $1,200 in silver coins from defendant. A later appraisal revealed that the coins were worth approximately $400.

Mrs. Boucher identified the $10,000 check as one she and her husband had given to defendant on February 5, 1987. She stated that the money had come from certificates of deposit which had matured. She also testified that defendant was in her home on February 5, 1987, and that he had engaged in general conversation with her and her husband. Mrs. Boucher then stated that when Mr. Boucher mentioned they had $10,000 to invest, defendant began describing his Aztec Marketing (Aztec) operations. As a result of this conversation, Mr. Boucher agreed to invest $10,000 in Aztec at a 9.25% rate of return. Mrs. Boucher stated that it was their understanding that the investment would be for one year at 9.25% and that they could withdraw the money at any time after that year.

Mrs. Boucher testified that neither she nor her husband ever received a prospectus or literature concerning Aztec. Defendant did not provide the couple with a written agreement or a receipt for their check. Mrs. Boucher also testified that they made several requests for a receipt, but never received one. Approximately one year after the investment, Mr. Boucher asked defendant for the $10,000, but defendant said that he could not manage to return it.

On January 25, 1988, the Bouchers received a call from defendant. He stated that the police had ransacked his house, and he wanted

to know if the Bouchers had known about it ahead of time.

On February 9, 1988, defendant sent the Bouchers an interest check for $950 on their $10,000 investment. A two-page agreement accompanied the check. The agreement had no time limit for repayment of the $10,000 principal. The agreement also gave defendant full authority to manage the investment and provided for forfeiture of the Bouchers' $10,000 investment if the Bouchers withdrew from the agreement. The agreement was not consistent with the Bouchers' understanding of their investment, and the Bouchers refused to sign it.

Mrs. Boucher also testified that shortly before trial, defendant sent them a check for $1,000 along with a document stating that defendant's new company, Emergency Response, Inc., had assumed the "loan" which the Bouchers had made to defendant.

A checking services manager for Champion Federal Savings and Loan in Bloomington, Illinois, testified that defendant and his fiancee had a joint personal account at Champion Federal. The manager stated that there was no account at Champion Federal in the name of Aztec Marketing; however, the manager did note that the checks and deposit slips in the defendant's joint personal account bore the name of Aztec Marketing.

Defendant testified that Aztec Marketing was his company which he ran out of his home. He stated that he was the sole employee. He claimed on direct examination that he invested the Bouchers' $10,000 in inventory for Aztec. On cross-examination defendant admitted that he made little effort to determine the Bouchers' financial situation before taking their $10,000 and that he deposited the $10,000 check into his personal account the same day he received it. He also admitted that after depositing the $10,000, he wrote checks on his account for bills to a chiropractor clinic and gas company, for a new stove and refrigerator, and for a down payment on a $22,000 car. Defendant claimed that he used this car in his work. Defendant further testified that the bank account he put the $10,000 into was now closed.

Defendant argues that he was not proved guilty beyond a reasonable doubt of theft by deception because the only payment which was due the Bouchers was in accordance with his agreement with the Bouchers and was paid on time. This payment, however, was made after the search of defendant's house. At trial, it was established that defendant was made aware of the investigation into his dealings with the Bouchers after the search warrant was executed. Defendant's payment to the Bouchers does not preclude a finding of guilt.

■ The evidence established at trial is not so improbable as to create a reasonable doubt of defendant's guilt. A person commits

theft by deception when he knowingly obtains by deception control over property of the owner and intends to deprive the owner permanently of the use or benefit of the property. (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 16—1(a)(2)(A).) Specific intent to defraud may be proved by circumstantial evidence. (*People v. Rolston* (1983), 113 Ill. App. 3d 727, 731, 448 N.E.2d 965, 967.) After viewing the above evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the elements of theft by deception in this count proved beyond a reasonable doubt.

### B. THE CHARGES INVOLVING HILDA FEHR

Defendant was charged with three counts of theft by deception of Hilda Fehr. The charges related to checks received from Mrs. Fehr totalling $43,000.

Mrs. Fehr testified that she was 76 years old at the time of trial, lived alone, and had been a widow since 1983. Prior to retirement, she and her husband had been farmers.

Mrs. Fehr indicated that defendant first came to her home in December 1986 and sold her three insurance policies and some Amway products. She stated that defendant returned to her home often, about three times a month. Mrs. Fehr also testified that defendant sold her a burglar alarm and a water system. She got to know defendant well and liked him. Mrs. Fehr and defendant eventually began to discuss investments, and she ended up buying a $10,000 annuity through defendant from the Jackson National Life Insurance Company (Jackson National). That annuity pays her $108 per month. Thereafter, Mrs. Fehr and defendant continued to talk about investments. She told defendant that she had $25,000 in the bank but thought it was unhandy to have it there. She stated that defendant wanted the money "right away. He wanted it." Mrs. Fehr's testimony continued:

"Q. [Assistant Attorney General] Did you also have an $8,000 CD?

A. [Hilda Fehr] That was later on. I had got $8,000 when the certificate was due and then he said you want me to invest that too, so I was thinking this all went to the Jackson National and I would add that to it.

Q. Why were you thinking it was going to Jackson National?

A. Because he said you want to invest that. We always talked about Jackson National. I thought that was were he was going to put it."

Mrs. Fehr then identified the checks made out on April 1, 1987, for $8,000, and April 27, 1987, for $25,000, and stated that defendant filled out these checks for her to sign. Defendant acknowledged filling out the checks. The checks were made out to Aztec Marketing. Mrs. Fehr's monthly annuity from Jackson National did not increase. In addition, defendant did not give Mrs. Fehr a receipt for the checks or any type of agreement concerning the checks when he obtained them from her.

Mrs. Fehr testified that at a later date defendant talked to her about investing in pay phones. Defendant wanted her to give him $10,000 to invest in the pay phones. He told her it "would be a good thing and we could make a lot of money on it." They were to be partners, and defendant said "he would take care of the money and give me my share." He did not say what her share was supposed to be. On June 15, 1987, Mrs. Fehr gave defendant a check for $10,000 for the purchase of five pay phones. The check was cashed. Mrs. Fehr never saw any phones and was never told where they were located.

Mrs. Fehr was not given a written agreement concerning the pay phones until August 4, 1987. The agreement was backdated to April 30, 1987, and was similar to the agreement defendant had given to the Bouchers to sign. Mrs. Fehr testified she signed the agreement without reading it, and when she did read it, she did not understand it. The agreement limited her return to a share of the after-tax profit and forfeited her entire share if she withdrew from the agreement. The agreement also noted that Mrs. Fehr had given defendant $33,000 and called for a return of the "cash equivalent of Two Thousand Nine Hundred and Seventy dollars of net profit from Aztec Marketing owned and operated by David Lambert. Initial payment to commence on June 1, 1988, and to continue for eleven years." This language fell short of providing for a return of Mrs. Fehr's initial investment, let alone any profit.

Mrs. Fehr testified that by the time of trial, defendant had repaid her approximately $2,800. At least one of these payments came from defendant's fiancee, rather than defendant himself. As with the Bouchers, the payments did not begin until after defendant learned that he was being investigated for his dealings with Mrs. Fehr. She stated that defendant started making payments to her "about a half a year" after she signed the pay-phone agreement. In August 1987, Mrs. Fehr was contacted by an Illinois State Police division of criminal investigation agent concerning her dealings with defendant. She informed defendant of the visit.

Several witnesses called by the State established that defendant

had not carried through on the pay telephones. An employee of Amway testified that while Amway sold pay telephones, defendant did not order any such phones from Amway. An employee of the Illinois Commerce Commission (ICC) testified that ICC issues certificates of authority on applications for customer-operated pay-telephone service. Defendant filed such an application in July 1987, but had withdrawn his application by the fall of 1987. Employees of three telephone companies that serviced that Bloomington area testified that defendant had no pay telephones placed in the Bloomington area.

Defendant testified that all money received from Hilda was for investment in Aztec Marketing. He said the $33,000 obtained in April 1987 was a way for Mrs. Fehr to get a better return on her money. Defendant also testified that he had gone to great lengths to get pay telephones placed and that he was on the verge of closing a deal for them. Defendant went into great detail on this subject.

On cross-examination, defendant testified that the $33,000 investment was nonrefundable and non-interest bearing, and that any return on the investment was contingent on his making a profit. Additionally, defendant testified the $33,000 had been deposited in the personal account he shared with his fiancee and the account was now closed. He also recalled that Mrs. Fehr's name appeared on the search warrant papers given to him at the time the search was executed and that he made his first payment to her four days later. All other payments to Mrs. Fehr had been made since defendant's indictment. Defendant acknowledged taking the $10,000 for the pay phones and never purchasing any.

Defendant further testified that Aztec Marketing was no longer in existence and that he never informed Mrs. Fehr of this fact. Nonetheless, defendant stated that the Bouchers and Mrs. Fehr need not be concerned about the disappearance of Aztec Marketing because their "investments" in Aztec were really just "loans" to defendant. Defendant claimed there is no difference between a loan and an investment and that the absence of Aztec was irrelevant because "it's still me. I am still liable for it."

Defendant argues that he was not proved guilty beyond a reasonable doubt of theft by deception because failure to refund money to dissatisfied customers is not necessarily proof of a specific intent to defraud. In support of his argument, defendant cites *People v. Rolston* (1983), 113 Ill. App. 3d 727, 448 N.E.2d 965.

In *Rolston*, the defendant was charged with four counts of theft by deception. Defendant, who was in the business of installing windows on residences, had been contacted by four separate persons to

have windows installed. He received down payments from each of them and gave various representations to them as to when the windows would be ordered and when they would be installed. However, the installations were delayed and the defendant made representations as to the reasons for the delays and when the installations could be expected. He knew some of the representations to be false. At one point or another each of the persons requested his money back, but the defendant indicated that he did not have the money to return to them.

At trial, defendant indicated he had taken the orders believing he could fulfill them. He used the money to pay some immediate business and living expenses, hoping to cover the cost of the first orders with subsequent orders. The subsequent orders did not come in as the defendant expected, but defendant testified he never intended to take money from his customers without delivering windows to them. The defendant was convicted on all counts. *Rolston,* 113 Ill. App. 3d at 728, 448 N.E.2d at 965.

On appeal, the court found that the State had failed to sustain its burden of proof. (*Rolston,* 113 Ill. App. 3d at 731, 448 N.E.2d at 968.) It noted the State had relied on defendant's failing to fulfill the contracts, failing to order the windows after receiving the down payment, cashing the down payment check, and lying to several of the customers regarding the status of their orders. The court stated, however, that "[a] defendant's failure to fulfill a contract is not proof of a specific intent to defraud." *Rolston,* 113 Ill. App. 3d at 732, 448 N.E.2d at 968.

The court further noted that "a failure to refund money to dissatisfied customers is not necessarily proof of a specific intent to defraud. [Citation.] Thus, we are left with evidence of the defendant's failure to order the windows and his false statements to customers explaining the delays." *Rolston,* 113 Ill. App. 3d at 732, 448 N.E.2d at 968.

■ While it is true, as the defendant in the present case asserts, that there are similarities between *Rolston* and the case at hand, defendant fails to acknowledge the overwhelming evidence presented against him at trial. In addition, defendant's lack of credibility as a witness takes his case beyond a mere failure to fulfill a contract.

After viewing the above evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of theft by deception in these counts proved beyond a reasonable doubt.

## C. THE CHARGES INVOLVING LOIS BRADLEY

Defendant was charged with 16 counts concerning his dealings with Lois Bradley. For each of eight checks obtained from Mrs. Bradley, defendant was charged with one count of theft by deception and one count of criminal breach of fiduciary duty. The checks were as follows:

| Payee | Date | Amount |
|-------|------|--------|
| Transport Life | 7-22-85 | $728.30 |
| Transport Life | 8-01-85 | 683.30 |
| Transport Life | 8-07-85 | 497.00 |
| United American | 3-01-85 | 1931.30 |
| United American | 5-08-85 | 870.00 |
| United American | 5-18-85 | 475.20 |
| United American | 7-03-85 | 653.40 |
| United American | 8-26-85 | 1012.00 |

Defendant was convicted of 14 of these counts and acquitted as to the March 1, 1985, transaction in the amount of $1,931.30.

Robert Bradley, Mrs. Bradley's son, testified that his mother had been a widow since 1980 and had died on March 5, 1986, at the age of 78. He also testified his mother had had a series of heart attacks and was hospitalized in 1984. In 1985, she had another heart attack and had open-heart surgery in June or July of that year. Mr. Bradley then stated that although his mother had returned to her home after her surgery, her physical and mental health had deteriorated. She was a patient in the psychiatric ward of Mercy Hospital in September 1985 and entered a nursing home in November 1985 because she was unable to bathe or feed herself.

Mr. Bradley was aware of defendant's dealings with his mother. He saw defendant at his mother's home on several occasions and said his mother seemed fond of defendant, serving him iced tea and cookies whenever defendant came to her home. Mr. Bradley on one occasion asked defendant why he was selling his mother so many insurance policies and said to defendant, "The first thing you know my mother will be selling the farm if it wasn't tied up in the will and she will be buying insurance policies with it." Mr. Bradley testified defendant then replied, "We can break the will."

Mr. Bradley further testified that his mother was a poor business person. He obtained power of attorney for his mother's business affairs in November 1985 and was the executor of her estate. He was familiar with his mother's handwriting and testified that the checks comprising the State's exhibits were signed by his mother but were not made out by his mother. All of these checks were paid by his

mother's bank.

Robert Golwacki, marketing vice-president for Transport Life Insurance Company (Transport Life), testified as to his company's procedures for determining whether checks made payable to Transport Life had been received and applied to a policy purchase. He testified his company had no records of any application for insurance or billings for insurance renewals that would correspond to the State's exhibits. He further testified that defendant had never been appointed as an agent for Transport Life.

Golwacki further indicated that an Owen Haycox was an agent for Transport Life from January 1985 until June or July 1985. Two policies were issued to Mrs. Bradley in Haycox's name. However, Golwacki was unaware of whether the signature on the applications was actually Haycox's. He testified that the money represented by these exhibits did not bear any relationship to the insurance policies actually issued by his company to Mrs. Bradley. He also testified that general agents would sometimes utilize subagents and those subagents were required by the Illinois Department of Insurance to be appointed by the insurance company to write insurance for that company.

Larry Hutchison, counsel for United American, testified to the procedures of his company for determining whether a check payable to the company was ever received or applied to issuance of any policy. His records showed that the company did not receive either the funds or an insurance application that corresponded to the State's exhibits. The company did receive an application which corresponded to one of the exhibits, but there was no record of receipt of the funds. Hutchinson identified several other exhibits as various insurance policy applications for different types of coverage issued to Mrs. Bradley. The checks contained in the State's exhibits did not correspond to these applications.

On cross-examination, Hutchinson was questioned further about the $1,931.30 check. It was shown that his company received an application for a $1,000 annuity with a check for $1,888. In his check of the records, Hutchinson was unable to determine where the additional $888 was applied. The $1,888 check was dated March 1, 1985, and the State's exhibit was dated March 1, 1985. Apparently, the jury found this evidence raised a reasonable doubt as to this exhibit and acquitted defendant on the charges stemming from this transaction.

Charles McGinnis, a handwriting expert for the Federal Bureau of Investigations, testified that Mrs. Bradley signed the checks in ques-

tion but that defendant filled in the additional information. McGinnis testified that defendant also signed Haycox's name to the 14 insurance applications to United American. Moreover, McGinnis testified that two insurance applications to Transport Life, allegedly signed by Haycox, had been signed by defendant. Defendant also signed Haycox's name to approximately 87 checks drawn on the Gold Key Marketing account.

Defendant testified that he targeted the elderly in his insurance sales. He also testified that when he first met Mrs. Bradley, he was aware she was an elderly widow living alone. Defendant testified that Mrs. Bradley had been in good health during 1984 and stated that she bounced right back after her open-heart surgery. Defendant acknowledged that as an insurance salesman he had to be careful in making sure people did not duplicate their coverage. He testified that when he met Mrs. Bradley she had 25 to 30 insurance policies. Defendant then stated that he obtained an additional 20 to 25 checks from her for policies.

Defendant testified that he collected over $3,000 from Mrs. Bradley in October 1985 and deposited the $3,000 in a Gold Key Marketing account. Defendant also testified that he wrote checks to himself from this account. When asked if he had written a lot of checks for cash and to himself from that account, defendant stated, "I don't know what you consider a lot, but probably."

Defendant stated he had once been an agent for United American but had been terminated by that company. He testified that he wrote United American policies over Haycox's signature because United American would not accept a policy with his name on it. Defendant had earlier testified that he, Haycox, and Hugh Good had formed Gold Key Marketing as an insurance agency in Illinois. He testified that Haycox was the general agent and that all money and all applications went through him. Defendant further testified that he signed Haycox's name with Haycox's approval.

Finally, defendant testified that he continued to sell Mrs. Bradley health insurance before and after her open-heart surgery and he did not mention her health problems in any of the insurance applications. He also testified that he had been convicted of two felonies in Indiana in 1984.

After viewing the above evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found defendant proved guilty of these counts beyond a reasonable doubt.

## IV. SENTENCING ISSUES

### A. CLAIMS THAT DEFENDANT'S SENTENCE WAS EXCESSIVE

Defendant was sentenced to a total of 8 years of imprisonment on each of the 11 convictions for theft by deception. As stated by the trial court, defendant's sentence on each count was five years, plus a three-year extended term on each conviction pursuant to section 5—5—3.2(b)(4)(ii) of the Unified Code of Corrections (Code) (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 1005—5—3.2(b)(4)(ii)). The trial court ordered all sentences to be served concurrently.

Before addressing defendant's argument that the sentences imposed were excessive, we think we should comment on the sentencing procedures employed by the trial court. In sentencing defendant on each felony theft count, the court stated it was imposing a sentence of five years (the maximum sentence for a Class 3 felony under section 5—8—1(a)(6) of the Code (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 1005—8—1(a)(6))) plus a three-year extended term pursuant to section 5—5—3.2(b)(4)(ii) of the Code (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 1005—5—3.2(b)(4)(ii)). That latter section states that an aggravating factor is present and an extended-term sentence may therefore be imposed when a defendant is convicted of a felony committed against a person 60 years of age or older at the time of the offense. Section 5—8—2(a)(5) of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a)(5)) provides that when the court finds such an aggravating factor to be present, it may sentence an offender as follows: "(5) for a Class 3 felony, a term shall be not less than 5 years and not more than 10 years."

We conclude that under section 5—8—2 of the Code, there is but one sentence when the court chooses to impose an extended term. An offender who is eligible for an extended-term sentence need not be so sentenced. However, if the court in its discretion chooses to impose an extended-term sentence, then that sentence must be imposed under section 5—8—2 of the Code. The "bifurcated" sentence imposed here is not in accordance with the provisions of section 5—8—2 of the Code, and such "bifurcated" sentences ought not be utilized in the future.

Because in this case, the sentencing order is sufficiently clear to discern the trial court's intent, we need not address this issue further.

Defendant argues that because there was no violence involved in any of the charges against him and because he has no history of violent criminal activity, his sentences were excessive. He further asserts that his sentences were excessive because there was no evidence pre-

sented that his conduct had a significant impact or effect on any of the victims.

Section 5—5—3.2(a) states in pertinent part:

"The following factors shall be accorded weight in favor of imposing a term of imprisonment or may be considered by the court as reasons to impose a more severe sentence under Section 5—8—1:

\* \* \*

(3) the defendant has a history of prior delinquency or criminal activity;

\* \* \*

(6) the defendant utilized his professional reputation or position in the community to commit the offense, or to afford him an easier means of committing it;

\*\*\*

(8) the defendant committed the offense against a person 60 years of age or older." (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 1005—5—3.2(a).)

Section 5—5—3.2 then continues:

"(b) [T]he following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender:

\* \* \*

(4) When a defendant is convicted of any felony committed against:

\*\*\*

(ii) a person 60 years of age or older at the time of the offense." (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 1005—5—3.2(b)(4)(ii).)

Further, section 5—8—2(a)(5) states:

"Extended Term. (a) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present. Where the judge finds that such factors were present, he may sentence an offender to the following:

\* \* \*

(5) for a Class 3 felony, a term shall not be less that 5 years and not more than 10 years." Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a)(5).

■■ ■ A review of the record reveals that aggravating factors in both imposing a term of imprisonment and in imposing an extended term of imprisonment were present in the case at hand. First, defendant was convicted in two counties in Indiana of felony theft and then lied about these convictions in obtaining his insurance agent's license in Illinois. Second, defendant was sentenced on 11 different felony counts. And third, defendant's victims were all over 60 years of age.

The sentence to be imposed is left to the discretion of the trial court. In imposing sentence, the court should consider the nature and circumstances of the offense, as well as the history, character, and condition of the offender. (*People v. Almo* (1985), 108 Ill. 2d 54, 70, 483 N.E.2d 203, 210.) A reviewing court will not reduce a sentence unless there is an abuse of discretion. *Almo*, 108 Ill. 2d at 70, 483 N.E.2d at 210.

The defendant's criminal behavior was particularly reprehensible. He preyed upon elderly citizens, first gaining their trust and then violating it. Section 5—5—3.2(a)(7) of the Code provides, as an additional aggravating factor, that "the sentence is necessary to deter others from committing the same crime" (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 1005—5—3.2(a)(7)). If our elderly citizens are to be protected from con artists like this defendant, harsh sentences ought to be imposed upon criminals who prey upon the elderly. By imposing such sentences, the courts may deter similar crimes from being committed.

It is not the function of this court to second-guess trial courts regarding sentences. We find the trial court in this case did not abuse its discretion. We specifically reject defendant's arguments that his sentences are excessive because he has no history of violent criminal activity and because there was no evidence presented that his conduct had a significant impact or effect on any of the victims.

### B. THE ORDER OR RESTITUTION

■■ Defendant argues the trial court erred in ordering restitution to be paid in the amount of $57,919.20, less any amount shown to have been paid by exhibits introduced at trial, because the order did not (1) indicate the conditions of payment of the restitution, (2) provide a time limit or method of payment, (3) take into account the ability of the defendant to pay, and (4) take into account that defendant had been sentenced to eight years in prison.

Section 5—5—6 of the Code states in pertinent part:

"In all convictions for offenses in violation of the Criminal Code of 1961 committed against any person 65 years of age or older in which such person received any injury to their person

or damage to their real or personal property as a result of the criminal act of the defendant, the court shall order restitution as provided herein. In all other cases the court shall at the sentence hearing determine whether restitution is an appropriate sentence to be imposed on each defendant convicted of an offense. If the court determines that an order directing the offender to make restitution is appropriate the offender may be sentenced to make restitution which shall be determined by the Court as hereinafter set forth:

(a) At the sentence hearing, the court shall determine whether the property may be restored in kind to the possession of the owner or the person entitled to possession thereof; or whether the defendant is possessed of sufficient skill to repair and restore property damaged; or whether the defendant should be required to make restitution in cash, for out-of-pocket expenses, damages, losses, or injuries found to have been proximately caused by the conduct of the defendant or another for whom the defendant is legally accountable under the provisions of Article V of the Criminal Code of 1961.

(b) In fixing the amount of restitution to be paid in cash, the court shall allow credit for property returned in kind, for property damages ordered to be repaired by the defendant, and for property ordered to be restored by the defendant; and after granting such credit, the court shall assess the actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim named in the charge and such other victims who may also have suffered out-of-pocket expenses, losses, damages, and injuries proximately caused by the same criminal conduct of the defendant. *** If a defendant fails to pay restitution in the manner or within the time period specified by the court, the court may enter an order directing the sheriff to seize any real or personal property of a defendant to the extent necessary to satisfy the order of restitution and dispose of such property by public sale.

\* \* \*

(f) *Taking into consideration the ability of the defendant to pay, the court shall determine whether restitution shall be paid in a single payment or in installments, and shall fix a period of time not in excess of 5 years within which payment of restitution is to be paid in full.*" (Emphasis added.) (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 1005—5—6.)

Thus, the restitution provision does not require the court to hold a

hearing separate from the sentencing hearing to assess the financial capacity of the defendant to make restitution, but does require the court to determine the manner and time of payment. The defendant's financial capacity is a required consideration only (1) when determining the manner of payment, and (2) if a petition to revoke restitution is filed. Ill. Rev. Stat., 1988 Supp., ch. 38, pars. 1005—5—6(f),(g); *People v. White* (1985), 135 Ill. App. 3d 563, 566, 482 N.E.2d 134, 136.

The record reveals that the trial court did consider defendant's ability to pay restitution, even though it was not required to do so. At trial, defendant's testimony indicated that he had on hand $20,000 worth in inventory. In the presentence report, defendant stated that he had $25,000 worth in office equipment. At the hearing on defendant's post-trial motion, the court noted that he had been informed by the probation office that the sheriff took into custody less than $300 worth of defendant's assets. The court then discussed with counsel the nature of defendant's assets. It was then revealed that the estimate of $25,000 worth of inventory by the defendant included his automobile, against which there was a loan of $19,000. At sentencing, the trial court entered an order requiring seizure of all of defendant's assets, including all of his business assets and bank accounts.

■■ That defendant has been ordered to serve a term of imprisonment in no way renders the order of restitution improper. The term of imprisonment is instead a factor to be considered by the trial court for whatever weight the court wishes to give it when assessing the defendant's ability to pay and in determining the manner and time of payment. *White*, 135 Ill. App. 3d at 567, 482 N.E.2d at 136.

■■ The restitution order in this case, however, does not provide for the manner of payment or for a time limit in which payment is to be made. Therefore, we remand to the trial court with directions to amend its order of restitution in accordance with the views expressed herein. In all other respects, the convictions and sentences imposed are affirmed.

Affirmed and remanded with directions.

KNECHT, P.J., and McCULLOUGH, J., concur.