In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-3676

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WILLIAM A. ELLIS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 449—**Robert W. Gettleman**, *Judge.*

———————

ARGUED JANUARY 19, 2006 —DECIDED MARCH 8, 2006

———————

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* William Ellis, former bishop of the Apostolic Pentecostal Church in Morgan Park, Illinois, pleaded guilty to one count of willfully making and subscribing a false income tax return, in violation of 26 U.S.C. § 7206(1). At sentencing, the district court found that Ellis had abused his position of trust and had obtained over $10,000 in illegal income without reporting it. Applying enhancements for this conduct, the court imposed a sentence of eighteen months' imprisonment. Ellis challenges the enhancements as well as the reasonableness of the sentence. We affirm.

**I.**

William Ellis became bishop of the Apostolic Pentecostal Church ("APC" or the "church") in 1995. Soon thereafter, Ellis proceeded to shake an ostensibly moribund church out of its doldrums, growing the church coffers and drawing more people into the pews. The weekly collections rose from $7,000 to $41,000, and church membership increased from 500 to 2,000 people. Ellis was the head of the church; although APC had a board, Ellis "would simply issue directives to be followed by the board." APC rewarded Ellis for his efforts with a healthy salary: in his tax return for 1997, for instance, he claimed that he earned $109,924.

Nonetheless, Ellis chose to supplement his salary by taking money directly from the Sunday collection without reporting it on his tax returns. According to former APC officials, shortly after Ellis began his work there, he demanded $1,000 from the Sunday collection, a practice that he followed on most subsequent Sundays. Ellis explained that he wanted the money as cash rather than as part of his salary in order to avoid taxes.

Although his flock was not aware of Ellis's actions, some officials apparently knew and raised questions about the practice. The chairman of the APC board, for instance, questioned Ellis about it, telling him it amounted to "stealing" and "deceiving God's people." Ellis rationalized his actions by saying "I bring it in, and I take it out." Ellis also warned the chairman of the board "[d]on't muzzle the ox." When a deacon told him that his actions were wrong, Ellis responded "[t]hat's the way you take care of your pastor?" and "[y]ou have a lot to learn about how to take care of your pastor." In order to cover themselves, several APC officials who were aware of Ellis's practice

made notes about the payments to him in the records of the weekly offering sheets. Ellis instructed them to stop making the records. Despite assurances that the church would raise his salary if it was not enough, Ellis refused such an arrangement.

In addition to the money taken from the Sunday collections, Ellis also failed to include on his tax returns sundry other benefits, such as a Mercedes that he used for both personal and church business, making personal credit card and life insurance payments with church funds, and using the APC credit card for personal expenditures. From these benefits and the plundering of the collection plate, the government calculated that Ellis had additional gross income in the amount of $520,602 in the years of 1996 through 2001, resulting in a large tax deficit.

The government indicted Ellis on five counts of willfully making and subscribing a false income tax return, in violation of 26 U.S.C. § 7206(1), one count of failure to file an income tax return, in violation of 26 U.S.C. § 7203, and one count of causing a domestic financial institution to fail to file a report required by 31 U.S.C. § 5313(a). Ellis pleaded guilty to one count of making a false tax return for the year 1997. At the sentencing hearing, the district court heard testimony and arguments regarding potential enhancements for abuse of a position of trust and obtaining over $10,000 in income from illegal sources without reporting it. The district court imposed both enhancements, which produced a Guidelines range of 18 to 24 months. After reflecting on Ellis's many good works and the severity of his crime, the district court sentenced him to 18 months' imprisonment. Ellis appeals.

**II.**

**A.**

Ellis challenges each of the two enhancements that the district court imposed. "Post-*Booker* we continue to review the court's application of the Sentencing Guidelines de novo and its factual findings for clear error." *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005); *see also United States v. Mabrook*, 301 F.3d 503, 510 (7th Cir. 2002).

The abuse of a position of trust enhancement provides "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." U.S.S.G. § 3B1.3; *see United States v. Baldwin*, 414 F.3d 791, 798 (7th Cir. 2005). For the enhancement to apply, Ellis must have: (1) occupied a position of trust and (2) abused that position in a manner that significantly facilitated the commission or concealment of his offense. *See United States v. Cruz*, 317 F.3d 763, 766 (7th Cir. 2003). In making our determination, we analyze the circumstances from the perspective of the victim, looking beyond formal labels to the actual relationship that existed and the responsibilities that the victim entrusted to Ellis. *See Baldwin*, 414 F.3d at 798.

The district court did not commit clear error when it determined that Ellis had abused a position of trust. Ellis argues that the enhancement is improper because APC, whose trust he abused, was not a victim of his tax fraud because it was financially prospering under his pastoral care. This is less than convincing. To begin with, even if we were to accept Ellis's victimless theory, the enhancement does not require a particular "victim" relationship between the criminal and the person or group whose trust has been

abused. *See Cruz*, 317 F.3d at 766 ("[c]ourts may apply the abuse of trust enhancement even if the defendant did not occupy a position of trust in relation to the victim of the offense of conviction"). Here, there can be no doubt that Ellis held a position of trust in the church and used his position to facilitate this crime. Specifically, Ellis, who was in complete control of the church, demanded cash payments directly from the Sunday offering. The church did not authorize this; the few people who knew about the practice challenged him, but were cowed by haughty rebukes about the proper treatment of a pastor. Ellis also attempted to thwart the members of the church who were keeping track of these payments in order to better conceal his crime. Ellis's tax fraud was only possible because of his bishop's chair.

In any event, it is clear that APC was a victim. Ellis claims that the offers to improve his salary by the head of the APC board (while trying to talk Ellis out of stealing from the collection plate) and the healthiness of church finances prove his point that he deserved (and thus took) more. They do not. While APC might have been willing to increase his salary, that was a decision for the church, not for him. What Ellis committed was theft; he did not tell APC that he wanted an increased salary and had not received permission for the additional money. Nor can the overall healthiness of church finances salvage his actions. Ellis's argument, essentially a slightly more sophisticated version of "I bring it in, and I can take it out," betrays a fundamental misappre-hension. The funds were not his. While no doubt his skillful ministry explains to a large extent the uptick in contribu-tions, they were contributions to the church, not to him. The church was not entitled to just a healthy cut of the increased revenues; it was entitled to all of it. Clearly, APC was a victim of Ellis's scheme to extract tax-free income.

Ellis also challenges the imposition of an enhancement for failure to report more than $10,000 in income from an illegal source. U.S.S.G. § 2T1.1(b)(1). Ellis suggests that the church's revived financial state and some suggestions that he could be given a raise proved that this money was not from an illegal source. Again, the district court did not commit clear error. As discussed above, Ellis stole from the Sunday offerings, taking thousands of dollars without permission from the church. Moreover, he used APC funds to pay his personal credit cards and life insurance, and racked up thousands more on APC credit cards for personal expenditures. Ellis contends that the government failed to show his intent to commit theft by deception, but such intent can be shown from circumstantial evidence, *see, e.g., People v. Lambert*, 552 N.E.2d 300, 306 (Ill. App. Ct. 1990), and has been shown by the evidence here. The more than $500,000 that Ellis took from APC during the course of his episcopacy was derived from his illegal activities, making the enhancement completely appropriate.

## B.

Ellis also argues that his sentence was unreasonable. In our post-*Booker* world, a district court has the obligation to correctly compute the Guidelines range and then craft a reasonable sentence, consulting the factors found in 18 U.S.C. § 3553(a). *See United States v. Sharp*, 436 F.3d 730, 738-39 (7th Cir. 2006). Any sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness. *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). "This standard is deferential; a defendant can only rebut the presumption by demonstrating that the sentence is unreasonable when measured against the § 3553(a) factors." *Sharp*, at *8.

In this case, the district court did not impose an unreasonable sentence. With the exception of contesting the enhancements, neither of the parties contends that the district court erred in his calculation of the proper Guidelines range. At the sentencing hearing, the district court heard from both parties regarding what would constitute a proper sentence. In its comments, the district court clearly demonstrated an understanding of its post-*Booker* responsibilities and a concern for weighing the different mitigating and aggravating factors. The district court expressly considered a number of the § 3553(a) factors, including the nature of the offense, the seriousness of the offense, and the deterrence effect of any sentence. Going beyond these factors, the district court recognized the many good deeds that Ellis has done throughout his life, as well as his health and family circumstances. Still, the district court felt that a sentence at the low end of the Guidelines range was most appropriate for Ellis's actions. While we would not necessarily impose the same sentence as the district court, our inquiry is bound by substantial deference to it. The district court went through the proper steps, and we do not find that the sentence imposed is unreasonable.

### III.

Ellis committed a serious crime. He abused his position as bishop while pursuing his scheme to cheat the IRS. The district court thoughtfully weighed the various considerations bearing on Ellis's sentence and selected a reasonable one. Therefore, we AFFIRM the decision of the district court.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*