THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
THOMAS McMANUS, Defendant-Appellant.

Second District No. 2—88—0222

Opinion filed May 24, 1990.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Colleen M. Griffin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

Defendant, Thomas McManus, was convicted of eight counts of theft by deception (Ill. Rev. Stat. 1987, ch. 38, par. 16—1(b)) and one count of attempted theft by deception. The trial court sentenced defendant to two consecutive five-year terms of imprisonment on the theft by deception counts, to run concurrently with a 364-day sentence on the attempted theft by deception count. On appeal, defendant contends as follows: (1) that the evidence was insufficient to establish his guilt beyond a reasonable doubt because it failed to show he intended permanently to deprive the alleged victims of their property; (2) that the trial court improperly admitted evidence of other un-

charged crimes and misconduct by defendant; and (3) that the imposition of consecutive sentences was erroneous because each of the alleged offenses was part of a single course of conduct. We affirm.

The allegations against defendant in this case arose from his activities as president and sole shareholder of Great America Homes, Inc. (GAH), the activities of GAH, and defendant's actions as president and sole shareholder of Ameriwest Mortgage Corporation. Each of the victims signed an application to purchase a home from GAH and paid $500 to reserve the lot upon which GAH was to construct the home. Some of the victims also paid GAH additional sums as down payments for their homes. The homes were located in what GAH termed the Casitas area of the County Towne Development in unincorporated Lake County. Neither defendant nor GAH ever held any interest in any of the lots in the Casitas area. The eight thefts of which defendant was convicted and the attempted theft all took place between July 28, 1987, and August 14, 1987. Defendant was acquitted of two alleged thefts which purportedly took place between June 14, 1987, and June 28, 1987.

Richard Kinsella testified that in July 1987 he saw GAH advertisements in the Chicago Tribune and the Daily Herald. The advertisements stated that GAH was offering three-bedroom homes for sale at a price of $99,900 with no closing costs. Kinsella and his wife drove to a model home in an area GAH called the Gagewood subdivision. They met with Peggy Martin, a GAH employee who told them the company had built homes in Arizona and Florida and that McManus, who was now running the company, had been a vice-president with Ameriwest in Arizona. Martin also told the Kinsellas that any money they gave GAH as a down payment would be held in escrow.

A few days later the Kinsellas returned to the location and spoke to another GAH employee. They signed an application to purchase a lot in the Casitas area and gave the GAH employee a $500 check in order to reserve the lot. Several days later, GAH employee Bruce Sova told Richard Kinsella during a telephone conversation that any down payment would be placed in a jumbo money market account to be used as collateral for construction loans. On August 7, 1987, the Kinsellas went to the GAH office in Vernon Hills. They signed a contract to purchase the lot and the home to be constructed thereon by GAH and gave GAH a check for $4,625 as a further down payment. The Kinsellas subsequently attempted to obtain a refund from GAH but were unable to do so.

James Messina testified that he saw a GAH advertisement in the Chicago Tribune in August 1987. Messina went to a trailer at or near

the Casitas area and met with Peggy Martin, a GAH employee. Messina returned there a few days later on August 5, 1987, and once again met with Martin. On that date, Messina signed an application to purchase a lot in the Casitas area and gave Martin a $500 check as a deposit. Martin gave him a contract for the sale of the lot and a home to be built thereon and told him he would have to sign the contract and return with a down payment of 10% of the total cost within 10 days. Messina signed the contract, met with GAH employee Bruce Sova on August 14, 1987, and gave Sova a check for $9,750. Messina's contract contained a rider which stated that if he was not satisfied with the home and requested a refund within seven days of its completion, all sums he had deposited with GAH would be refunded. Messina's check for $9,750 was recovered by police before it was cashed. He never received any refund of the initial $500 payment.

George Rademacher saw the GAH advertisement in the Chicago Tribune and went to a GAH trailer near the Casitas section on August 1, 1987. He returned there with his wife on August 5, signed an application to purchase a lot and gave GAH employee Peggy Martin a check for $500. On August 8, the Rademachers went to the GAH offices in Vernon Hills, signed a contract to purchase the lot and gave Bruce Sova a check for $4,500 as a further down payment. Sova told him the money would be held in escrow. GAH never refunded any money to the Rademachers.

Ruby Bodame testified that she and her husband were referred to GAH by Georgeanne Depke of Properties Unlimited. The Bodames met with Peggy Martin on July 30, 1987, signed an application to purchase a lot, and gave Martin an American Express money order in the amount of $500. They met with Martin again on August 12 and told her they wanted a refund. Martin told them they would have to contact Bruce Sova.

Michael Bodame, Ruby's husband, testified that he went to the GAH offices in Vernon Hills on August 13 or 14 to get the refund. Sova told him to return the following week. When Bodame did so on August 18, the office was practically cleared out. Bodame saw Chuck Swanson, a GAH employee, who told him there was no money. The Bodames never received a refund from GAH.

Paul Melonas testified that he saw the GAH advertisement in the Chicago Tribune. On August 1, 1987, Melonas and his wife met with GAH salesman John Deagan at the GAH trailer. They signed an application to purchase a lot that day and gave Deagan a check for $500. They never signed a contract to purchase the lot. Melonas and his wife did not receive any refund.

Barbara Pease testified that she and her husband saw the GAH advertisement in the Tribune. On August 4, 1987, they met with GAH employee Arno Schrimmer at the GAH trailer. The Peases gave Schrimmer a check for $500 and filled out an application to purchase a lot. They never signed a contract to purchase a lot. The Peases did not receive a refund.

Susan Ogawa testified that her husband saw the GAH advertisement in the Tribune. On August 2, 1987, the Ogawas met with Peggy Martin at the GAH trailer, filled out an application to purchase a lot, and gave her a check for $500. She called later that week to cancel the house and try to get her money back. The Ogawas were able to stop payment on the check before it was cashed. Defendant was therefore only convicted of attempted theft on the charge relating to the Ogawas.

James Callahan went to the GAH trailer on August 4, 1987, after seeing the GAH advertisement in the Tribune. He returned on August 6, filled out an application to purchase a lot, and gave GAH employee John Deagan a check for $500. Callahan did not pay any further amounts to GAH and did not receive a refund of $500.

Ralph Pepper testified that after he saw the GAH advertisement in the Tribune, he went to the GAH trailer with his fiancee, Lisa Corcoran, and met with Arno Schrimmer. Corcoran gave Schrimmer a check for $500 dated August 4, 1987, and the couple filled out an application to purchase a lot. Pepper went to the GAH office in Vernon Hills, met with Bruce Sova, and asked for a refund about a week after he saw Schrimmer. Sova told him to return in another week. Pepper did so, but the GAH offices were closed.

Over defendant's objection, the State was permitted to present testimony from three other witnesses who lost money deposited with GAH, even though none of the theft charges brought in this case involved those witnesses. The first of these witnesses, Jesse Shearin, testified that he met with defendant on April 4, 1987, at a model home in the Gagewood subdivision. Defendant made certain representations to Shearin at the meeting and made similar representations in a letter to Shearin dated April 8, 1987, which stated as follows:

> "Great America Homes, a wholly-owned subsidiary of Ameriwest Corporation, has been developing communities of fine homes for over twenty years. In addition to Illinois, the Corporation has constructed residential properties in Florida, Arizona, and New Mexico, as well as four midwestern states."

Shearin subsequently gave McManus $5,000 as a deposit on a lot in the Gagewood subdivision. Shearin never received a refund, and GAH

never constructed a home on the lot.

Lawrence Valenziano met with Bruce Sova at the GAH trailer in June 1987 and gave him a $500 check to reserve a lot. He met with Sova a few days later, signed a contract to purchase the lot, and gave Sova a $10,000 check as a down payment. Valenziano insisted on adding to the contract a clause which stated GAH had to show him what would be done with these payments prior to closing. Valenziano subsequently received a letter from defendant dated June 25, 1987, which stated in part as follows:

> "Please be advised that it is the policy of our company to place all our deposits in a real estate trust account. It is our further policy to accumulate your deposit together with other deposits for the purpose of purchasing certificates of deposit from our participating banks. *** We wish to impress upon you that these funds are held and are not used for construction purposes, nor any other purpose, but merely as an accommodation with our lender for purposes of construction financing."

GAH never built a home for Valenziano and never returned his money.

Steven Poland testified that he signed a contract to purchase a lot in the Evergreen subdivision on June 21, 1987, and gave GAH $11,300 as a deposit. In a July telephone conversation, McManus told Poland construction loans had already been obtained for the planned building. In an earlier telephone conversation, McManus had told Poland GAH was a subsidiary of Ameriwest out of Arizona.

Cathy Phillips testified that she served as defendant's personal secretary at GAH from late April 1987 until the company offices were closed in August 1987. Phillips and all other GAH employees who testified stated that defendant was known to them as J. Thomas McMann. At the end of April, during a conversation with Phillips, defendant told her he was a vice-president with Ameriwest Development Corporation, which had sent him to the Chicago area to market homes and that the company had been successful selling homes in Florida.

Phillips testified that she had certain duties with respect to the GAH checking accounts. At first, her only responsibility was to fill out deposit slips when funds were placed in the company's real estate trust account. She later took on additional responsibilities with regard to GAH's bank accounts and was an authorized signer on some of them.

Phillips stated that GAH had three accounts at Premier Bank in Vernon Hills. Customer deposits were originally placed into the real estate trust account. There was also a general checking account which

was used for the vast majority of the company's expenses, including payroll. Additionally, there was a special account at Premier which served as a kind of office petty cash account.

GAH also opened up a general checking account at Lake Forest National Bank in June 1987 which was used for making payments on land purchased by GAH. Defendant and Phillips opened up a personal checking account at the same bank in late June or early July. This account was used to loan money to Ameriwest Mortgage Company. At about the same time, GAH opened a checking account at the First National Bank of Waukegan. This account was used to pay subcontractors. Charles Swanson, a GAH project manager, was an authorized signer on this account. Defendant told Phillips that he wanted Swanson to sign all checks on this account so Swanson could take the heat if something happened.

According to Phillips, most of the money in the other accounts was transferred from the Premier real estate trust account which held customer deposits. Phillips stated that she typed up GAH payroll checks and defendant did not receive a regular salary from the corporation.

Charles Swanson began working for GAH as sales manager on May 20, 1987. He was subsequently promoted to project manager and then vice-president of administration. Swanson testified that he had previously worked in home building, sales, and marketing for about 15 years. He further testified that in late May or early June 1987 he was at a meeting with defendant and several GAH sales representatives. Defendant told the others they should tell customers their deposits would be placed in an interest-bearing escrow account and would be refunded with 5¼% interest if they were dissatisfied with the project or were unable to obtain mortgages.

Swanson was directed to attempt to obtain construction financing for GAH. He contacted a number of financial institutions and initially received positive responses from four or five. These institutions required certain financial statements and other documentation which McManus never provided. Swanson testified that GAH never commenced any construction in the Evergreen or Casitas areas. At the time GAH ceased operations in mid-August 1987, six to eight homes in the Gagewood area were in various phases of construction. GAH did not obtain any financing for the Gagewood project; the company was handling construction costs on its own.

During a July 1987 conversation, defendant told Swanson that GAH owned the Casitas property. Defendant also told Swanson during a May 1987 meeting that he had been a builder and had been with

Ameriwest Development.

Bruce Sova testified that he began work at GAH as director of sales and marketing on June 12, 1987. Sova had 14 years of prior experience in the real estate development field. During Sova's first week of employment, defendant told him GAH was part of Ameriwest Financial out of Arizona and was affiliated with a savings and loan that was part of Ameriwest. Defendant also told Sova around the same time that customer deposits would be used to purchase jumbo CD's in $50,000 amounts that would be used as leverage to obtain other funds for operating the company. Sova testified that this is what he told customers when asked what GAH would do with the money and that he never said it would be placed in an escrow account.

Sova further testified that in late July 1987 defendant told him they were going to put together an advertising program for the Casitas area. Emphasis was to be shifted from promoting the single-family homes in the Evergreen area to promoting the Casitas homes, which would be smaller. The advertisements regarding Casitas homes were placed in the Tribune shortly thereafter.

Peggy Martin testified that she worked as a sales representative for GAH from May 30, 1987, until August 15, 1987. During a meeting in May 1987, defendant told her GAH was a division of Ameriwest Financial Services of Arizona, a company whose stock was traded on the New York Stock Exchange. On or about June 13, 1987, she began working at a GAH trailer in the Evergreen subdivision.

Martin left the trailer three days later because at about 5:30 in the afternoon a man named Tim Towne entered the trailer, claimed to be the owner of the property, and requested that she leave. Martin then spoke to defendant on the telephone, and he stated Towne was his partner in the deal and not the sole owner of the land. Martin worked at a model home in the Gagewood subdivision for about a month and then returned to the trailer at the Evergreen site.

Martin stated that sometime between mid-June and early July 1987 she met with her supervisor, Sharon Dethlefsen. Dethlefsen told her that, according to Bruce Sova, customer deposits would be placed in jumbo CD's and would be refunded with interest upon completion of the home if the customer was dissatisfied. Dethlefsen testified that Sova told her this and also told her the jumbo CD's would be used to obtain construction loans.

Cynthia Koeller, a GAH sales representative, testified that McManus told her in a sales meeting in early June that customer money would be placed in an escrow account and would be refunded with interest if the customer did not like the home after it was built. Koeller

told these things to customers. She also testified that McManus told her he was a vice-president with Ameriwest Corporation from Arizona.

Richard Crane testified that he began working for GAH on May 12, 1987, as vice-president and director of operations. Crane had been in the construction field for about 30 years. During his two job interviews, defendant told him GAH was affiliated with Ameriwest, a large company with a lot of money behind it that was located in Phoenix. Crane testified that GAH engaged in some construction at Gagewood, but none in the Evergreen or Casitas areas. He also stated that defendant reversed the ordinary process for setting prices for homes. Ordinarily, the cost of constructing the home, together with the price of the home, would be considered in setting the selling price. Defendant, however, would set the selling price and tell Crane to build a home there for 35% less.

William Stapleton, an accountant, began working for GAH on July 17, 1987. Stapleton testified that the company's capital came solely from customer deposits. Stapleton went to the Bank of Waukegan in order to discuss financing for construction in the Evergreen area. The bank requested a financial statement, but Stapleton was unable to prepare it because he did not have the necessary documentation. Stapleton identified a personal financial statement prepared by defendant, which was admitted into evidence over a defense objection.

The State presented evidence showing that defendant incorporated GAH on April 13, 1987. Defendant also incorporated Ameriwest Development Company in Arizona on April 22, 1987. Defendant hired Terrence King to be in charge of Ameriwest Mortgage Corporation. King testified that defendant filled out a portion of that company's application for a license to operate as a mortgage banker in Illinois. Defendant stated in this portion of the application that the company is a wholly owned subsidiary of Ameriwest Development Company, an Arizona corporation, and that defendant owned 30% of the shares in the latter company while two other men owned the remaining shares. Defendant admitted to King in mid-August 1987 that he was the sole shareholder of Ameriwest.

Daniel Colin, a detective with the Lake County sheriff's police, testified that he had been investigating financial crimes since 1980 and had specialized training in the area. Colin testified that he went to Arizona in January 1988 and found no evidence that Ameriwest Development Company ever had an office at 2600 Central Avenue in Phoenix, the address mentioned in the articles of incorporation.

Colin also examined bank records from the GAH accounts. Ac-

cording to Colin, these records showed that with the exception of one $80,000 deposit, all funds deposited into the accounts originally came from down payments on homes by GAH customers. The total amount of customer down payments deposited in GAH accounts was slightly more than $600,000. The $80,000 deposit resulted from a payment to GAH on a house the company completed in the Gagewood area. Colin testified that $18,600 in funds went directly from GAH accounts to defendant. Another $6,300 went to defendant's landlord for rent on his home. Another $47,600 was expended in cash payments. Other evidence revealed that defendant arranged for the purchase of six automobiles in GAH's name. One of these was a Mercedes-Benz which defendant drove and the others were Cadillacs which defendant agreed to give certain GAH and Ameriwest employees at the time he hired them.

Veronika Romer testified that defendant rented a home from her in Libertyville beginning in mid-May 1987, at a cost of $1,400 per month. Romer identified defendant's application for lease which was admitted into evidence over a defense objection. Defendant stated in the application that his annual salary was $250,000.

Richard Villa testified that he is the corporate security manager of Ameriwest Financial Corporation, a bank holding company in New Mexico with several subdivisions. Villa stated that the two Ameriwest corporations established by defendant were not in any way part of Ameriwest Financial or any of its subsidiaries.

Tim Towne testified that he was part of a joint venture which purchased the land in the County Towne Subdivision during the fall of 1986. The other member of the joint venture was Home Federal Service Corporation of Rockford. Defendant met with Towne in late April or early May 1987 and told Towne he wanted to purchase the entire subdivision. Defendant stated he was from Phoenix, Arizona, and was working on some projects for Ameriwest Corporation. Towne mentioned that the price would be in excess of $3 million, and he would require proof of financing through a financial institution acceptable to his financial institution. Defendant told Towne that proof of financing would be no problem and that he would obtain financing from Albuquerque Savings and Loan. Defendant never got back to Towne with the necessary proof of financing, however. Towne subsequently sold the 75 lots in the Evergreen area to a man named Frank Blazevich. The closing on the Blazevich purchase was held on August 5, 1987.

After Blazevich entered into the purchase agreement for the 75 lots in late May or early June 1987, defendant began to inquire about purchasing the 33 lots in the Casitas area. On June 10, 1987, defend-

ant gave Towne a proposed contract for the purchase of these lots. He gave Towne a corrected contract on June 29, 1987, with a purchase price of $515,000, and also gave Towne a check for $25,000 at this time. At Towne's insistence, defendant placed a provision in this contract stating it would be null and void unless he delivered a financial commitment letter for $490,000 within 10 days. Defendant never produced such a letter, and the County Towne owners never signed either contract.

In mid-July 1987, Towne attended a meeting with defendant and defendant's attorney in order to review and discuss the proposed Casitas contract. A second meeting was held in late July or early August, but defendant did not show up. Defendant's attorney told Towne that defendant would not be at the meeting because he apparently could not obtain the necessary financing. Towne told defendant's lawyer that his group would take the property off the market and would sell it themselves to individuals.

Towne also testified that he found out in mid-June 1987 that GAH was operating a sales trailer on one of the County Towne Development lots under contract to Blazevich. Towne went to the trailer and directed the GAH employees to close the office. He telephoned defendant and Blazevich and told them not to offer lots for sale because this could adversely affect pending subdivision approval. In a later face-to-face meeting, Towne told defendant not to offer for sale lots which he did not own. Defendant sent Towne a letter dated August 4, 1987, in which he agreed to indemnify the Towne Development Company and its owners from any claims arising out of GAH sales activities. Towne had told defendant's attorney during their meeting that he would not return defendant's earnest money unless he received such a letter.

Frank Blazevich testified that in mid-May 1987 defendant negotiated with him to purchase the 75 County Towne Development lots he had acquired. Defendant stated he was a home builder from Arizona with $15 million of mortgage money available to him through Ameriwest Mortgage Company. Defendant signed a contract to purchase the property on June 9, 1987, and gave Blazevich earnest money checks totalling $23,325 in late July. Blazevich signed the contract in late July.

Blazevich, an automobile dealer, sold five Cadillacs to GAH in June and July 1987. In connection with the sale of these cars, defendant filled out a credit application and gave it to Blazevich. Blazevich identified the application in which defendant falsely stated he had an annual salary of $225,000 and had an ownership interest in the house

he leased from Romer.

Mark Peteler testified that he had been a loan officer at the First National Bank of Waukegan since 1986. Peteler stated that defendant met with him and Laurie Mortensen, the bank's mortgage loan officer, in June 1987. Defendant told them he was interested in obtaining financing for construction of homes in the Gagewood area and that he might be interested in obtaining financing for the Evergreen area at a future date. Peteler told defendant the bank would need personal and company financial statements, would need to know who was going to build the homes, and have copies of their resumes.

Defendant had a second meeting with Peteler and Mortensen on August 12, 1987. Terrence King was also present. Defendant stated he was now interested in financing for the Evergreen project. They spoke in detail about whether the bank would be able to make construction loans to GAH or loans to the individual customers. They also discussed the possibility of loaning money to defendant individually. Peteler told defendant at the end of the meeting that the bank had not received any of the information he had requested at the previous meeting. Defendant told Peteler the information would be on his desk by 9 a.m. the next morning. Peteler never received the information. The bank did not lend any money to defendant or GAH.

The jury found defendant guilty of eight counts of theft by deception and one count of attempted theft. The trial court subsequently imposed sentence, and defendant filed a timely notice of appeal following the denial of his post-trial motion.

■■ ■ Defendant first contends that the evidence presented by the State was insufficient to establish his guilt beyond a reasonable doubt. When faced with a challenge to the sufficiency of the evidence in a criminal case, the function of a reviewing court is to determine whether, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) In order to establish defendant's guilt on theft by deception charges, the State must prove beyond a reasonable doubt that (1) the victim was induced to part with money; (2) the transfer of the money was based upon deception; (3) defendant intended permanently to deprive the victim of the money; and (4) defendant acted with specific intent to defraud the victim. (*People v. Lighthall* (1988), 175 Ill. App. 3d 700, 705-06.) The trier of fact may infer intent to defraud from the facts and circumstances surrounding the transaction. *Lighthall*, 175 Ill. App. 3d at 706.

■■ Defendant argues that the evidence was insufficient to prove

the third element listed above, that he intended permanently to deprive the victims of their money without giving them anything of value in return. In making this argument, defendant relies primarily upon *People v. Rolston* (1983), 113 Ill. App. 3d 727, a case in which the court held the evidence insufficient to sustain convictions on four counts of theft by deception. (*Rolston*, 113 Ill. App. 3d at 733.) In *Rolston*, defendant, who operated a replacement window business, took orders for replacement windows and down payments from certain customers but failed to order the windows from the factory. The evidence showed that if defendant ordered fewer than 100 windows, he would have to pay freight charges, but he would not have to pay freight on an order of 100 windows. Defendant testified that the window orders did not come in as fast as he expected. He used the down payments he received to meet immediate business and living expenses. Defendant admitted lying to two customers by telling them their orders had been placed with the factory, but stated he believed at the time he would soon have enough orders to place an order of 100. (113 Ill. App. 3d at 728-30.) In reversing defendant's convictions, the court noted in *Rolston* that defendant was an authorized dealer who had received professional training from a reputable manufacturer, he had put substantial money into the business, fully performed one contract and partially performed another, did not try to avoid his customers, did not deny owing the customers money, and continued in business despite the charges. 113 Ill. App. 3d at 732-33.

The court stated in *Rolston* that the case was distinguishable from *People v. Ballard* (1978), 65 Ill. App. 3d 831, because in *Ballard* the evidence showed defendants knew they would not fulfill their contracts. (*Rolston*, 113 Ill. App. 3d at 732.) The defendants in *Ballard* sold tool distributorships to 12 individuals and promised to provide high quality tools, assistance in setting up accounts and locations to place the tools in high-volume retail outlets, and refunds if the buyers wished to cancel. (*Ballard*, 65 Ill. App. 3d at 832-33.) The evidence revealed that the tools were of poor quality, the accounts were for low-volume outlets, and defendants never refunded any money. 65 Ill. App. 3d at 833.

According to defendant, the instant case is analogous to *Rolston* because most of the money received from GAH customers was used for business expenses. Defendant also points out that GAH was a sizeable company which employed 20 to 25 people and which did engage in some home construction, completing one house in the Gagewood area. In our opinion, however, the evidence in this case was clearly sufficient for the jury to conclude that defendant never intended to

provide the victims anything of value for the money given to GAH.

First of all, the evidence is undisputed that GAH employees, at defendant's direction, accepted down payments from customers for land in which neither defendant nor GAH held any ownership interest and represented to the customers that their money would be held in escrow or used to purchase jumbo CD's which would only be employed to obtain construction financing. These representations were false.

Additionally, the evidence showed that defendant launched a promotional campaign for the Casitas area in late July 1987. Each of the victims paid deposits or down payments to GAH on or after July 28. Defendant, however, did not even show up for a meeting scheduled with Towne in late July or early August to discuss the proposed Casitas contract. Defendant's attorney told Towne at the meeting that defendant had failed to attend because he had apparently been unable to obtain the necessary financing. Towne told the attorney that his group was taking the property off the market and would sell it to individual home buyers themselves. Defendant's attorney then inquired about a refund of the earnest money paid by GAH. Towne stated he would only return the earnest money if GAH agreed to indemnify his group for any claims resulting from GAH sales activities. Towne subsequently received an indemnification letter from defendant dated August 4, 1987.

Most of the deposit money paid by the victims in this case to GAH for Casitas lots was paid on or after August. 4, 1987. Even though the proposed deal with Towne to purchase the Casitas area was clearly dead at this point, and defendant obviously recognized this when he sent the indemnification letter to Towne that day in the hope of having the earnest money returned, GAH continued accepting down payments for Casitas lots. Furthermore, defendant was aware in late June that he would be required to obtain a commitment for $490,000 in financing before Towne would sell him the Casitas property. The evidence concerning GAH's aborted efforts to obtain financing indicates defendant was aware when GAH started taking down payments on the Casitas area in late July that it would never receive the requisite financing to buy the land. The jury could have reasonably concluded from the evidence that in late July, when defendant decided to promote the Casitas area and GAH first received payments for Casitas lots from the victims in this case, defendant knew neither he nor GAH would be able to purchase the property from Towne. Therefore, the jury could have also reasonably concluded that defendant intended permanently to deprive the victims of their money with-

out giving them anything of value in return. We therefore reject defendant's argument that the evidence was not sufficient to prove him guilty beyond a reasonable doubt.

Defendant next contends he is entitled to a new trial because the State was erroneously permitted to present evidence of uncharged crimes and misconduct. More specifically, defendant argues that the three witnesses, who testified they made down payments to GAH between April and June 1987 for lots in the Gagewood and Evergreen subdivisions and stated that defendant and other GAH personnel made certain representations to them, should not have been permitted to testify because none of the charges in this case related to those witnesses. Defendant also argues that a lease application, a credit application for the purchase of automobiles, and two personal financial statements, all of which contained some false information, were not relevant and should not have been admitted into evidence.

Although defendant filed a post-trial motion, he did not assert in the motion that admission of the above evidence was error. Failure to raise an issue in a post-trial motion will result in waiver of the issue on appeal in the absence of plain error. (*People v. Enoch* (1988), 122 Ill. 2d 176, 187.) The purpose of the plain-error doctrine is to correct serious errors which may have deprived the accused of a fair trial. (*People v. Sommerville* (1990), 193 Ill. App. 3d 161, 171.) The doctrine will be applied in criminal cases if the evidence was closely balanced or the alleged error was so serious that it deprived defendant of a fair trial. (*Sommerville*, 193 Ill. App. 3d at 171.) Here, the evidence that defendant instigated a scheme to defraud prospective home purchasers is overwhelming. In light of the substantial evidence of fraudulent conduct and misrepresentations on defendant's part, any error in admitting the evidence in question, which concerned similar conduct, could not have deprived defendant of a fair trial. We therefore decline to apply the plain-error rule.

Furthermore, defendant's argument is without merit. Evidence of other crimes or misconduct on defendant's part is admissible if relevant for any purpose other than to establish defendant's propensity to commit crime, so long as its relevance outweighs its prejudicial effect. (*People v. Stewart* (1984), 105 Ill. 2d 22, 62.) If defendant's conduct in connection with a prior crime bears such similarity in significant respects to defendant's conduct in connection with the charged offense as to show the offenses resulted from a general plan or scheme, evidence of defendant's conduct in connection with the prior offense is admissible. (*People v. Brown* (1962), 26 Ill. 2d 308, 316.) Jesse Shearin, Steven Poland, and Lawrence Valenziano all testi-

fied that they made deposits or down payments on lots to GAH and did not get their money back. Shearin and Poland testified that defendant told them GAH was a part of Ameriwest of Arizona. Valenziano stated that defendant represented to him in a letter that his down payment would be placed in GAH's real estate trust account and would be used solely for the purpose of obtaining certificates of deposit from participating banks. The victims in this case attested to similar misrepresentations by GAH employees. Certain GAH employees testified that defendant told them to make these representations. The testimony of Shearin, Poland, and Valenziano clearly indicates that defendant's misconduct toward them was part of a scheme or general plan that also resulted in the commission of the charged offenses. This evidence was therefore admissible.

The financial statements, lease application, and credit application were also both relevant and admissible. Mark Peteler, a loan officer with the First National Bank of Waukegan, testified that, when defendant met with him in August 1987 to discuss the possibility of obtaining financing, the possibility of lending money to defendant personally was discussed. The fact that defendant evidently believed it necessary to place false personal financial information in these documents indicates defendant was probably aware that a person of his financial standing could not reasonably hope to borrow a large sum of money from a bank. These documents are thus relevant evidence of defendant's intent to defraud the victims in this case because they tend to show defendant knew he could not obtain the necessary financing to purchase the Casitas area.

Although the evidence in question was relevant, it should only have been admitted if its probative value outweighed its prejudicial effect. The trial court's determination of this question will not be disturbed absent an abuse of discretion. (*People v. DeCesare* (1989), 190 Ill. App. 3d 934, 942.) Here there was no abuse of discretion. As we have previously stated, there was overwhelming evidence of fraudulent conduct and misrepresentations on defendant's part. This additional evidence of such conduct therefore could not have prejudiced defendant. The trial court was correct in admitting the evidence.

Defendant's final contention is that the trial court erred by imposing consecutive sentences because such sentences cannot be imposed for "offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(a).) Although the evidence indicates the nine offenses in question were part of a larger scheme of financial fraud, this does not

mean the nine incidents constituted a single course of conduct within the meaning of the above provision. (See *People v. Shaw* (1985), 133 Ill. App. 3d 391, 405.) When separate victims are harmed by distinct acts directed at the victims separately, section 5—8—4(a) does not prohibit the imposition of consecutive sentences. (*People v. Schlemm* (1980), 82 Ill. App. 3d 639, 649; *People v. Lindsay* (1978), 67 Ill. App. 3d 638, 647.) To hold otherwise would only encourage commission of additional crimes under certain circumstances because no additional sentence could be imposed for subsequent offenses. *Lindsay*, 67 Ill. App. 3d at 649.

In the case at bar, defendant took money from nine different individuals or couples on separate occasions. Although the offenses were part of a common scheme, they involved distinct acts directed separately against different victims. Accordingly, section 5—8—4(a) did not preclude the imposition of consecutive sentences.

For the above reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

REINHARD and INGLIS, JJ., concur.