THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SCOTT ALAN MORRISON, Defendant-Appellant.

Fourth District   No. 4—92—0952

Argued December 15, 1993.—Opinion filed April 13, 1994.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Roger Simpson, State's Attorney, of Monticello (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In April 1990, a jury convicted defendant, Scott Alan Morrison, *in absentia*, of four counts of theft by deception of property having a value in excess of $300, a Class 3 felony (Ill. Rev. Stat. 1985, ch. 38, pars. 16—1(b)(1), (e)(3)), and four counts of conspiracy to commit theft by deception of property having a value in excess of $300 (Ill. Rev. Stat. 1985, ch. 38, pars. 8—2(a), 16—1(b)(1)). The trial court vacated the four conspiracy convictions and, in May 1990, sentenced defendant, *in absentia*, to an extended term of eight years' imprisonment on each of the four counts of theft. The court ordered the sentences on counts I and II to run concurrently and the sentences on counts III and IV to run concurrently to each other but consecutively to the sentences on counts I and II. The court also ordered defendant to pay restitution in the amount of $45,500 to the victim. Later, however, the court reduced the amount of restitution to $18,349.49 because the victim had received payment of a codefendant's proportionate share and a portion of defendant's forfeited bail deposit.

Defendant appeals his convictions and sentences, arguing that (1) the trial court improperly denied his request for substitution of the trial judge; (2) the State did not prove him guilty beyond a reasonable doubt; (3) the court improperly allowed certain testimony from an attorney; (4) the court improperly considered unreliable evidence when sentencing him; (5) the court improperly imposed consecutive sentences; and (6) the court erred by imposing a restitution order. We affirm.

## I. BACKGROUND

In May 1989, the State charged defendant with four counts of theft by deception of property having a value in excess of $300 and four counts of conspiracy to commit theft by deception of property having a value in excess of $300. In October 1989, as defendant climbed the Piatt County courthouse stairs in an attempt to receive a distribution from a fictitious trust created specifically to induce him to return to Illinois, the Piatt County sheriff's department arrested him on those charges. While awaiting trial, he posted bond, and the court granted his request to leave the jurisdiction. However, he failed to appear at his trial in April 1990 or his sentencing hearing in May 1990.

Mrs. Dorothy Courson, defendant's former mother-in-law, was 74

years of age at the time of trial and testified that defendant had married her daughter, Tina, in May 1984. Tina died in May 1987. Mrs. Courson also stated that she approved of the marriage and that as of late August 1986, she got along well with defendant.

Mrs. Courson testified that in late August 1986, defendant told her he had passed a test to become an investment broker, obtained his broker license, and could make investments for her. Defendant then asked her if she had a certificate of deposit (CD) maturing in the near future which he might invest on her behalf and achieve a higher rate of return than she could get if she simply reinvested in another CD. Defendant told her about a company named Network International, Inc. (NII), which loaned money to small businesses, and then showed her a graph which indicated that NII had the highest rate of return among the businesses listed. Defendant also told her that she could expect a guaranteed rate of return of 20% on an investment with NII.

Mrs. Courson decided to invest in NII based upon defendant's recommendations, the graph defendant showed her, and the guaranteed interest rate. She also testified that normally she kept her money in CD's or bank accounts at a local bank, but because of the high rate of return that she believed she would receive from investing in NII, she thought investing with NII would be a good idea. Thus, on August 31, 1986, she withdrew $20,000 from a recently matured CD and signed a written agreement to invest this money in NII. Defendant, apparently acting as NII's agent, and Mrs. Courson's husband also signed this agreement.

Mrs. Courson testified that she thought defendant would receive a commission from each investment she made with NII, which would help her daughter and defendant. She explained that based upon the graph defendant had shown her, she thought that NII had been in existence for quite some time. Defendant did not tell her that he had an ownership interest in NII or that Eddie Stiffler, defendant's friend and business associate, also had an ownership interest in NII. She knew Stiffler to be a friend of defendant's.

The investment agreement had been prepared by an Illinois attorney and listed NII's address as Hawthorne Boulevard, Torrance, California. Under the agreement, the Coursons were to receive 20% interest on their $20,000, paid in six-month intervals or, alternatively, reinvested and compounded. At defendant's trial, when handed the $20,000 check which she had given defendant in August 1986, Mrs. Courson testified that she recognized Stiffler's signature as the endorser on the check. She explained that she had given defendant the $20,000 check to invest in NII, but not for either defendant's or Stiffler's personal or business expenses.

In September 1986, defendant again asked Mrs. Courson if she had any more CD's coming due and mentioned that he could get her a better interest rate as he did with the $20,000 she had just invested with NII. She testified that she agreed to invest another CD worth $11,500 with NII. Defendant brought her another investment agreement dated September 8, 1986, identical to the first agreement except stating an investment amount of $11,500. Mrs. Courson, her husband, and defendant each signed this agreement, and she tendered a $11,500 check to defendant.

At the time Mrs. Courson made these investments, she knew defendant was running a jewelry business at the Chanute Air Force Base in Rantoul, which sold jewelry to the servicemen. She explained that her investments with NII were not made to help defendant's jewelry business.

Mrs. Courson further testified that in the latter part of 1986, defendant moved to Denver, Colorado, and Stiffler moved with defendant to Colorado. However, her daughter stayed in the Piatt County area until late January 1987, when she also moved to Denver to live with defendant.

In late February 1987, Mrs. Courson received a "Federal Express" package from NII containing a letter dated February 20, 1987. (Every correspondence she received from NII came to her by Federal Express.) This particular letter was on NII letterhead showing a Torrance, California, address and signed by "Kathie E. Holloway, Director of Accounts." The Federal Express receipt accompanying the package also listed "Kathie Holloway" as the sender. The letter welcomed Mrs. Courson and her husband to the NII "smart family of investors" and quoted a guaranteed interest rate of 20% for their investments. The letter also listed investment options for the interest payments that would be coming due under the August 1986 and September 1986 agreements. The letter further stated that NII's records indicated that defendant was Mrs. Courson's agent and thanked the Coursons for joining the "NII family."

Mrs. Courson testified that in early March 1987, defendant called her and again requested that she invest in NII. She did so, investing another $10,000 with NII pursuant to a third agreement dated March 1, 1987. This agreement followed the form of the first two and indicated an interest rate of 25%. At this time, she also received a letter on NII letterhead dated February 27, 1987, containing a $2,000 check and stating that a $2,000 interest payment was enclosed. A few days after receiving this check, she received another $1,150 check for her September 1986 investment. Both of these letters were signed by Kathie Holloway.

Mrs. Courson testified that in April 1987, defendant again called to ask if she would invest some additional money with NII. She agreed to invest another $20,000 with NII and signed a fourth agreement dated April 15, 1987, again following the form of the prior agreements and indicating an interest rate of 30%. When she made the March 1987 and April 1987 investments, she did not authorize defendant or Stiffler to use that money for their personal or business expenses.

In the fall of 1987, Mrs. Courson received "interest" payments on each of her four investments which corresponded to the interest rate that she was supposed to receive on those investments. Each of these interest payments was accompanied by a letter on NII letterhead listing the Torrance, California, address and signed by Kathie Holloway, director of accounts.

In the spring of 1988, Mrs. Courson received additional "interest" payments on all four of her investments. The correspondence she received with the first interest payment in 1988 was no longer on NII stationery and none of the correspondence she received from NII thereafter had a letterhead. This first letter was signed again by Kathie Holloway, director of accounts, and informed Mrs. Courson that NII had changed its address to a location in Aurora, Colorado. This letter contained a handwritten note at the bottom of the letter. The second correspondence she received in 1988 was handwritten (all previous correspondence were typed), expressed sympathy for the recent death of Mrs. Courson's husband, and was also signed by Kathie Holloway. The third correspondence she received in 1988, which accompanied an interest payment, was also handwritten and signed by Kathie Holloway, "Account Department." The handwriting of these two letters differed from the handwriting in the note on the first letter. Also, the signature on the first letter differed from the signatures on all the other letters received from NII, including the two handwritten letters.

Mrs. Courson testified that in March 1988, she additionally received a form "1099—INT" for her 1987 income tax preparation. This Internal Revenue Service 1988 form listed NII as the payor and her as the recipient and indicated interest payments totalling $10,550, which matched the total amount she received from NII in 1987.

The last correspondence Mrs. Courson received from NII was dated August 31, 1988, and asked her if she would like to combine all of her interest payments due in the fall of 1988 into one payment. This letter was not on stationery but was signed Kathie Holloway, director of accounts. In most of the letters Mrs. Courson received from NII, defendant was mentioned as the Coursons' agent for

investment matters with NII. Mrs. Courson did not receive any interest payments in the fall of 1988, and she testified that in late September 1988, she sent a certified letter to NII, as required under the four investment agreements, asking to terminate each of the agreements and to receive a refund of all her principal. Stiffler signed for receipt of her certified letter in early October 1988. She also attempted to call defendant a few times about this matter, but his phone was disconnected. She received no further correspondence or payment from NII.

On cross-examination, Mrs. Courson explained that she had "loaned money to invest" in NII, but noted that defendant never discussed the structure of NII with her or the arrangement he had with NII regarding investments. She also reiterated that the money she invested with NII was not for defendant's jewelry business, which her daughter had helped operate. Mrs. Courson stated that while she was making these investments with NII, her husband was sick with cancer and unable to be directly involved in any business or financial decisions. However, she did discuss these investments with him. She also denied any knowledge or awareness of the fictitious trust arrangement that her attorney, Keith Hays, ultimately created in an attempt to bring defendant to Illinois.

On redirect examination, Mrs. Courson explained that defendant never used the term "loan" when discussing these investments with her, nor was the term "loan" used in any correspondence she received from NII. She noted that each of the letters from NII only stated or discussed her "investments" with it.

Nancy Joe Merz, an assistant vice-president at Busey Bank in Urbana, testified that on August 28, 1986, defendant and Stiffler set up a commercial bank account under the name of "Network International, Inc. (NII)." They listed an address for NII in Torrance, California. Both defendant and Stiffler signed the signature card; as a result, either could individually gain access to the account. She testified that defendant and Stiffler initially deposited $200 in cash to open the account. Thereafter, on September 3, 1986, they deposited $20,000 into the account, and on September 9, 1986, they deposited an additional $11,500. They made numerous transactions during that September, bringing the balance down to approximately $1,550 by the end of the month. These transactions included writing checks to "cash" or themselves totaling approximately $17,600, writing checks to "S&M Industries" totaling $5,000, and obtaining a cashier's check of $3,100 for an unknown destination. The activity on the account decreased dramatically in October, November, and December 1986 as the balance slowly decreased to approximately $80 by year's end. The account was closed in February 1987.

Hays, a Monticello attorney, testified that Mrs. Courson contacted him in January 1989 about retrieving the money she had invested in NII. Pursuant to her request, he filed a civil suit on her behalf in February 1989 against defendant, Stiffler, and Kathie Holloway. This lawsuit claimed that they had fraudulently converted the Coursons' funds paid to NII.

To further investigate the matter and in an attempt to serve papers from this civil action upon the listed defendants, Hays went to Denver in February 1989. He explained that the purpose of this trip was threefold: (1) to locate the listed defendants; (2) to determine whether NII was an identifiable ongoing business and to locate any evidence of such a business; and (3) to determine whether the listed defendants had any assets against which a judgment could be obtained.

Hays testified that he first went to defendant's apartment in Denver. Hays knew this apartment's address had also been listed as defendant's business address. Hays described this property as "a classic apartment complex, rental in nature, nothing but residential premises." Hays also visited an address on Havana Street in Aurora, Colorado, which the correspondence Mrs. Courson received in early 1988 listed as NII's new address. There, Hays found a business called the "Mailroom" located in a strip mall. The Mailroom was not an official United States Post Office, but offered private mailboxes and other mailing services, including United Parcel Service and Federal Express shipping. Hays also mentioned that no office building existed at this address, and no separate offices or suites existed within the Mailroom itself.

Hays also went to a Troy Street address in Aurora, Colorado. Defendant had given this address to Mrs. Courson as NII's new address, and it was also listed on the last few Federal Express receipts Mrs. Courson received. At this address, Hays found an office complex consisting of single rooms that the landlord rented, including secretarial services, mailroom services, and telephone answering services. Hays could not locate an existing NII office at the complex. While in Colorado, Hays could not locate any of the defendants in the civil action and therefore did not serve any of them with Mrs. Courson's lawsuit.

Hays also testified about a fictitious trust that he had created in an effort to induce defendant to return to Illinois. In the spring of 1989, Hays sent a letter to defendant at his mother's address in Arkansas, stating that defendant's deceased wife, Tina (Mrs. Courson's daughter), was an heir to a trust which had been created by an estate of a deceased relative of Tina. The letter explained that this

trust had expired and that upon its distribution, defendant could possibly receive up to $78,000 as Tina's husband.

Hays testified that initially defendant had retained an attorney to contact Hays regarding this trust. However, defendant personally contacted Hays in July 1989, stating that he had discharged his attorney on this matter. Defendant indicated that he was in the process of moving, but if Hays could contact defendant's sister, who lived in Arkansas, she could give defendant any message concerning this trust. Hays next heard from defendant in mid-September 1989, and Hays told him that he expected the estate trust to pay out soon, but he did not know the details. He asked defendant to call him back in early October 1989. As requested, defendant called Hays, who informed defendant that he would have to appear in court in Piatt County on October 10, 1989, to receive his distribution from the trust.

Hays testified that on October 10, defendant called him to tell him that he could not be there that day and requested to delay the receipt of his portion of the trust until October 11. Defendant told Hays that he wanted to avoid seeing any of the Courson family and that he was not looking for a "family reunion." On October 11, Hays told defendant that he had arranged for defendant to appear at the Piatt County courthouse at 11 a.m. that day. Hays testified that defendant appeared at that time and was promptly arrested on the courthouse stairs.

Hays also testified regarding the IRS 1099 tax form that Mrs. Courson received from NII. He noted that a 1099 form for the tax year 1987 would indicate the year 1987 on the form; however, the form Mrs. Courson received from NII displayed the year 1988. Hays also noted that instructions on how to use the 1099 form are listed on the back of a 1099 form. However, no instructions appeared on the reverse side of the 1099 form that Mrs. Courson received from NII. Hays further noted that a taxpayer's copy of the 1099 form is typically a carbon copy or a copied version of an original 1099, but the 1099 form that Mrs. Courson had received from NII was typed as an original. Hays also stated that the 1099 form that she received looked as if it had been clipped from a book of forms or instructions for use in 1988, not the proper form for reporting 1987 income.

On cross-examination, Hays testified that when he went to Denver, he discovered that Stiffler and defendant had filed articles of incorporation for NII. These articles of incorporation stated that the purpose of NII was "to market wholesale and retail jewelry to wholesalers and the general public[, to] market wholesale and retail products[, and to] run and operate a telephone and referral talk ser-

vice." The articles were filed with the Colorado Department of State in January 1987. In August 1987, defendant and Stiffler amended the articles of incorporation to expand the purpose of the corporation to include any legal or lawful purpose under the Colorado Corporation Code (Colo. Rev. Stat. Ann. § 7—1—101 *et seq.* (West 1990)). Additionally, defendant was listed as the registered agent for NII.

Also, during cross-examination, Hays stated that he shared the information he obtained during his investigation of this matter with the Piatt County State's Attorney and the local United States District Attorney. Defense counsel asked Hays whether he had encouraged these offices to commence a criminal investigation or prosecute defendant regarding these matters. Hays denied doing so, insisting that he merely shared this information with these offices. Defense counsel then asked Hays if he was attempting to gain an advantage over defendant by pushing the criminal matter against defendant. Hays responded that he was not.

On redirect examination, Hays stated that during his trip to Denver, he could not confirm whether NII was a viable business entity which provided loans to small companies and paid out investments to investors. He explained that he was unable to confirm any operations on behalf of NII other than its opening of a bank account and its articles of incorporation. Hays also mentioned that he shared the information from his investigation with the Federal and State governments because he thought evidence existed which demonstrated defendant had violated criminal laws.

Kenneth Baughman, also an attorney in Piatt County, testified that at Hays' request, he visited the Torrance, California, address which had been listed as NII's first address. At this address, Baughman found what he described as a "private mailing station with mailboxes." This mailing station was located in a commercial complex with several small service outlets and restaurants. The mail station contained a wall of private mailboxes and maintained facilities for mailing items.

Robert Manint, chief deputy for the Piatt County sheriff's department, testified that he participated in an interview of defendant after he was arrested on October 11, 1989. Hays and the Piatt County State's Attorney were also present at this interview. During the interview, defendant stated that he and Stiffler had formed a partnership and sold investment stocks to the Coursons under the name of Network International. Defendant indicated that the total amount that the Coursons had invested was $61,500 over four separate contracts. Defendant told them that NII was headquartered in Denver, Colorado. Defendant also told them that he knew Kathie

Holloway, who was Stiffler's sister. He told them that Holloway had done several things for NII, including writing letters to the Coursons regarding their investments on NII letterhead, and that she had opened a mail drop box in Torrance, California, under the name of NII.

Defendant denied any knowledge of NII's incorporating in Colorado. He indicated that the money he had received from the Coursons was used to invest in a jewelry show conducted in Memphis, Tennessee. He stated that the jewelry booth set up at this fair was done under the name of another company defendant had formed with Stiffler. Defendant also told them that the Coursons had not been informed how their money would be used. Defendant further explained that Stiffler thought of the idea to form NII and had talked defendant into asking the Coursons for money to invest in the company. Defendant stated that he knew interest payments were given to the Coursons and that he himself had received checks from Stiffler for his work for NII.

Manint further testified that during this interview, defendant also discussed a trip to Europe he took in May 1987 with Stiffler, Holloway, and Tina. Defendant indicated that Stiffler made all the arrangements for this trip, purchased the tickets, and provided expenses for the trip out of money from NII. Defendant also stated that the Coursons were notified that NII was just an investment company, but they were not informed about the jewelry sales or any operations of NII. Defendant admitted that Holloway had no direct involvement with NII other than her writing letters to the Coursons, and that she was not director of accounts with NII.

On cross-examination, Manint testified that defendant had also mentioned that his mother had invested $15,000 in NII. Defendant also indicated that the trip to Europe was a vacation that included attending the wedding of Stiffler's son.

Defense counsel presented no evidence on defendant's behalf. As stated above, the jury found defendant guilty on all four counts of theft by deception and all four counts of conspiracy to commit theft by deception. The trial court vacated the four conspiracy convictions and sentenced defendant on the four theft convictions.

## II. ANALYSIS

### A. *Substitution of Judge Motion*
Defendant first argues that the trial court erred by denying his motion for substitution of judge. He asserts that the plain language of his motion for substitution of judge alleged that Judge John Shon-

kwiler, the trial judge, would be prejudiced against him. The State responds that defendant failed to comply with the statutory requirements for substitution of judge under section 114—5(a) of the Code of Criminal Procedure of 1963 (Procedural Code) (Ill. Rev. Stat. 1989, ch. 38, par. 114—5(a)).

On October 30, 1989, defendant filed a motion entitled "Motion for Recusal or Alternate Relief," which reads as follows:

"1. The Defendant, SCOTT MORRISON, seeks to have the Hon. John Shonkwiler remove himself from further consideration of these proceedings, primarily due to the close ties the Court has to the parties, who are residents of Piatt County, and the attorney/investigator, who will be an instrumental participant in the proceedings.

2. The Defendant was apprehended on a warrant with a bond of $500,000.00, based on charges that are Class 3 (four counts) and Class 4 (four counts) felonies.

3. Prior to the issuance of the warrant, a private attorney had initiated a civil case on behalf of the complainant, herein, against the same Defendant; that Court file was impounded by this Court at some time, unknown to this Defendant.

4. The same attorney aforementioned, who practices frequently, and it is believed, primarily, before this Court, arranged for the Defendant to be in Piatt County, under false pretenses; subsequent to the arrest, he participated in the interrogation of said Defendant, as an adjunct of the State's Attorney, and he also testified at the preliminary hearing.

5. The Court may be required to determine questions of attorney misconduct and even the appointment of a Special Prosecutor, along with the usual questions of credibility.

6. Reports indicate that the Sheriff of Piatt County, at the time this Defendant was expected to appear, voluntarily, in Court in the Piatt County Courthouse, caused that facility to be evacuated, at least in large part, thereby creating a very unusual publication of the prospects for this Defendant; it is not known to the Defendant who, if anyone, else sanctioned this evacuation, thus contributing to the prejudice caused against this Defendant.

7. Under these circumstances, the Defendant should not be required to invoke his rights, under Ch. 38, § 114—5 (I.R.S.), but should Judge Shonkwiler decline to recuse himself, then this Defendant does wish to preserve his right to substitution, for prejudice, as set forth in § 114—5(a).

WHEREFORE, the Defendant, SCOTT MORRISON, prays this Court grant his request and remove itself from further participation in these proceedings, or in the alternative, that the Hon. John Shonkwiler be substituted from these proceedings."

In November 1989, Judge Shonkwiler held a hearing on defendant's motion and declined to recuse himself because he did not believe that defendant's allegations had any effect on his ability to preside over defendant's case. Judge Shonkwiler also noted the confusion created by paragraph seven of defendant's motion over whether defendant was making a motion under section 114—5(a) of the Procedural Code and then stated the following:

"Any defendant has an absolute right to file a motion for substitution of judge. That is his right. All judges understand it. If the defendant chooses to exercise his rights, that's up to the defendant. Another judge gets the case. But again, under *People v. Burns*, I think the statute should be followed, and the court does not believe that the statutory provisions of 114—5(a) have been followed. As such, if—again, I just don't know whether this is a 114—5(a) motion. Again I refer back to paragraph seven of your motion. You are asking [that] defendant should not be required to invoke his rights, indicating to this court that he hasn't invoked his rights. So, if you meant this motion for recusal also to be a motion for substitution of judge, I do not believe that the statutory provisions have been followed, and it is denied."

In December 1989, defendant filed a motion to reconsider the court's denial of this motion, which the court also denied.

Section 114—5(a) of the Procedural Code states the following:

"Within 10 days after a cause involving only one defendant has been placed on the trial call of a judge the defendant may move the court in writing for a substitution of that judge on the ground that such judge is so prejudiced against him that he cannot receive a fair trial. Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion. The defendant may name only one judge as prejudiced, pursuant to this subsection; provided, however, that in a case in which the offense charged is a Class X felony or may be punished by death or life imprisonment, the defendant may name two judges as prejudiced." Ill. Rev. Stat. 1989, ch. 38, par. 114—5(a).

Courts should liberally construe section 114—5(a) of the Procedural Code in order to promote, not defeat, a defendant's statutory right to substitute judges, thereby safeguarding his basic right to a fair trial. (*People v. Langford* (1993), 246 Ill. App. 3d 460, 465, 616 N.E.2d 628, 631-32, citing *People v. Walker* (1988), 119 Ill. 2d 465, 480-81, 519 N.E.2d 890, 896; see also *People v. Redisi* (1989), 188 Ill. App. 3d 797, 801, 544 N.E.2d 1136, 1139.) A defendant has an absolute right to a substitution of judge if he meets the statutory requirements of section 114—5(a) of the Procedural Code. (*Redisi*, 188 Ill. App. 3d

at 801, 544 N.E.2d at 1139.) If the trial court improperly denies a motion for substitution of judge, any subsequent action taken by the court is void. (*People v. Williams* (1991), 217 Ill. App. 3d 791, 793, 577 N.E.2d 944, 946.) However, the defendant's failure to comply with the statutory requirements of section 114—5(a) of the Procedural Code bars automatic substitution. *People v. Burns* (1989), 188 Ill. App. 3d 716, 721, 544 N.E.2d 466, 468.

▪ A defendant's motion for substitution of judge under section 114—5(a) of the Procedural Code must comply with four requirements: (1) it must be made within 10 days after the case is placed on the judge's trial call; (2) it can name only one judge if the defendant is charged with less than a Class X felony; (3) it must be in writing; and (4) it must allege that the judge is so prejudiced against defendant that he cannot receive a fair trial. *Burns*, 188 Ill. App. 3d at 720, 544 N.E.2d at 468; Ill. Rev. Stat. 1989, ch. 38, par. 114—5(a).

In *Burns*, the defendant filed a motion for substitution of judge within the required 10 days, but failed to allege that he could not receive a fair trial because of the judge's prejudice against him. A little over a week later, but beyond the statutory 10-day period, defendant amended his motion to add this allegation. The trial court denied defendant's motion because he failed to make the allegations of prejudice within the statutory 10-day period. (*Burns*, 188 Ill. App. 3d at 719-20, 544 N.E.2d at 467-68.) In upholding the trial court, this court found that defendant's original motion failed to meet the minimal statutory requirements for substitution of judge under section 114—5(a) of the Procedural Code because it failed to allege prejudice, and that his amended motion which did allege prejudice was not made within the statutory 10-day period. (*Burns*, 188 Ill. App. 3d at 720-21, 544 N.E.2d at 468.) This court concluded that the failure to allege prejudice could not be considered a "mere technical error," noting that "[a] defendant who wishes to avail himself of an automatic substitution must meet the requirements of the statute." *Burns*, 188 Ill. App. 3d at 721-22, 544 N.E.2d at 469.

Defendant claims that *Burns* is distinguishable because his motion in this case does contain several specific allegations of prejudice. He also claims that he used the term "prejudice" to describe how the allegations would affect him, whereas the defendant in *Burns* did not. Defendant further points out that his motion specifically sought the alternative relief of recusal or substitution of judge, thus distinguishing his motion from the defendant's motion in *Burns*.

The State responds that defendant's motion in this case is similar to the motion in *Burns* because defendant did not make any allegations of prejudice, "let alone [allege] prejudice[ ] *** [such] that

[defendant] could not receive a fair trial." The State contends that the term "prejudice" appearing in paragraph seven of defendant's motion, taken in context, was not an allegation of prejudice, but was merely recited within the context of his request to *preserve* "his right to substitution for prejudice." The State also notes that even if defendant's motion in this case does somehow request substitution, it does not properly allege any prejudice.

■ We focus on paragraph seven of defendant's motion in order to resolve this issue because this is where defendant first discusses substitution of the trial judge. We conclude that paragraph seven not only fails to allege prejudice, it also fails to explicitly request substitution of judge, speaking instead of how defendant wishes "to preserve his right to substitution" if the trial judge denies his recusal request. This "alternative pleading" is not permitted under section 114—5(a) of the Procedural Code, whose requirements for a substitution motion are straightforward and uncomplicated.

In *Burns*, we essentially held that a defendant should *clearly* and *definitively* set forth the four statutory requirements when making his request for substitution. As Judge Shonkwiler noted at the hearing on defendant's motion (and as the State correctly argues), defendant here has not done so.

Recently, in *People v. Ground* (1994), 257 Ill. App. 3d 956, this court addressed a defendant's right to demand a speedy trial under section 103—5(b) of the Procedural Code (Ill. Rev. Stat. 1991, ch. 38, par. 103—5(b)). We noted that a speedy trial motion "constitutes the *only* action a defendant can take that might result in the State's inability to prosecute him, no matter how terrible the defendant's crimes nor how clear the evidence of his guilt." (Emphasis in original.) (*Ground*, 257 Ill. App. 3d at 959.) Based upon that significance, we noted that any effort or conduct by the defendant to hide, camouflage, or bury his speedy trial demand could not be tolerated, and we therefore held that a defendant must explicitly set forth in the title or heading of his pleading that he is demanding a speedy trial under section 103—5(b) of the Procedural Code. *Ground*, 257 Ill. App. 3d at 959-60.

Although the stakes are not as high when, as in this case, a defendant seeks a substitution of judge as when he demands a speedy trial, we nonetheless view them as almost as significant because *everything* the trial court does after improperly denying a defendant's motion for substitution is *void*. Therefore, we reaffirm our holding in *Burns* and now unequivocally state that a defendant's request for substitution of judge must be *clear* and *unequivocal* and further hold that this request must also be made *without contingency*.

In this case, defendant did not clearly request a substitution of judge. Furthermore, nowhere in defendant's motion does he specifically allege that Judge Shonkwiler was so prejudiced against him that he could not receive a fair trial. Defendant asks us to infer an allegation of prejudice from his assertions in paragraphs one through six of his motion. However, these assertions track his request for *recusal* and do not expressly relate to a separate motion for substitution. We hold that this case is similar to *Burns*, and we affirm the trial court's denial of defendant's motion, as well as its denial of defendant's motion to reconsider.

Defendant argues that under *Langford*, an ambiguous motion for substitution of judge "should not be summarily denied without allowing [the] defendant to clarify his mistake, if he requests [to do so]." In *Langford*, the defendant filed a timely, written motion for substitution of judge alleging that the defendant believed he could not receive a fair and impartial trial before the trial court. However, the defendant was not charged with a Class X felony and he also alleged that he could not receive a fair and impartial trial in front of a second named judge. The trial court determined that because defendant listed two judges while not being charged with a Class X felony, he must be seeking a substitution of judge for cause under section 114—5(d) of the Procedural Code (Ill. Rev. Stat. 1989, ch. 38, par. 114—5(d)). *Langford*, 246 Ill. App. 3d at 461, 616 N.E.2d at 629.

The *Langford* court stated that the defendant's motion was ambiguous because it did not cite whether it was made under section 114—5(a) or section 114—5(d) of the Procedural Code, but noted that the defendant's motion did meet the statutory requirements. (*Langford*, 246 Ill. App. 3d at 466, 616 N.E.2d at 632.) The court found that the extra paragraph in defendant's motion which alleged that defendant would be prejudiced by a second judge was "merely *** surplus and unnecessary language, which *** did not detract from the soundness of the motion." (*Langford*, 246 Ill. App. 3d at 467, 616 N.E.2d at 633.) The court concluded that the defendant should be allowed to correct the "technical defect" created by his listing two judges, and therefore reversed the trial court and remanded the case to allow the defendant to "clear up his mistake." *Langford*, 246 Ill. App. 3d at 468, 616 N.E.2d at 633.

Unlike the defendant's motion in *Langford*, which contained the necessary language but added a second judge, defendant's motion in this case did not contain the necessary language. As we noted earlier, defendant's motion failed to clearly request a substitution of judge or to specifically make an allegation that he could not receive a fair trial because of the trial judge's prejudice. Defendant's motion does

not "merely [contain] surplus and unnecessary language" (*Langford*, 246 Ill. App. 3d at 467, 616 N.E.2d at 633), but only discusses the basis for his recusal motion and tosses in at the end a request to "preserve" his motion for substitution. Thus, *Langford* is distinguishable from both this case and *Burns*.

## B. *Sufficiency of the Evidence*: *Intent To Permanently Deprive*

Defendant next argues that the State did not prove him guilty beyond a reasonable doubt. He asserts that the State's evidence was insufficient to establish that he intended to permanently deprive the Coursons of the use of their property.

When reviewing a defendant's claim regarding the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. (*People v. Campbell* (1992), 146 Ill. 2d 363, 374-75, 586 N.E.2d 1261, 1265-66.) Thus, the reviewing court cannot substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses, and a criminal conviction will not be reversed unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of defendant's guilt. *Campbell*, 146 Ill. 2d at 375, 586 N.E.2d at 1266; see also *People v. Smith* (1993), 246 Ill. App. 3d 647, 651, 616 N.E.2d 737, 741.

■ In order to sustain a conviction of theft by deception, the State must prove beyond a reasonable doubt that the defendant (1) induced the victim to part with money; (2) obtained the money by deception; (3) intended to permanently deprive the victim of the use or benefit of the money; and (4) acted with specific intent to defraud the victim. (*People v. McManus* (1990), 197 Ill. App. 3d 1085, 1096, 555 N.E.2d 391, 399; see Ill. Rev. Stat. 1985, ch. 38, par. 16—1(b)(1).) A defendant's criminal intent usually must be proved by circumstantial evidence, and the existence of an intent to permanently deprive, which is a question for the trier of fact, may be inferred from the act of taking another's property. *People v. Veasey* (1993), 251 Ill. App. 3d 589, 591-92, 622 N.E.2d 1246, 1248; *People v. Brown* (1987), 163 Ill. App. 3d 976, 978, 516 N.E.2d 1349, 1351.

Defendant contends that the circumstances of this case do not support a conclusion that he intended to permanently deprive the Coursons of the use or benefit of their money. He states that Mrs. Courson received about $17,000 in interest payments from NII, which were made at approximate six-month intervals as required by the

four investment agreements. He notes that the agreements allowed the Coursons to withdraw their money at any time after one year had passed from the making the agreements, and that the agreements contained a confession of judgment clause. He also points out that no evidence exists that Mrs. Courson ever directly contacted him or that he received notice of her payment demand because only Stiffler signed a receipt for her demand. Based upon this evidence, defendant claims that Mrs. Courson did not fully pursue her legal remedies under the agreements. He also surmises that Tina "must have been [the] intended beneficiary of [Mrs. Courson's] largess." Finally, he asserts that he intended to use the money as investment capital for his and Tina's "fledgling" jewelry business.

■ Defendant essentially asks us to reweigh the evidence or speculate with him on other possible conclusions that could be reached from the evidence. However, plenty of evidence exists to support the jury's conclusion that the State sufficiently proved that he intended to permanently deprive the Coursons of their money. First, defendant fraudulently presented himself to Mrs. Courson as a licensed investment broker. He made it appear that NII had been in existence prior to her investments, and he did not reveal his or Stiffler's direct involvement in NII. He also never told Mrs. Courson that her money might be used for the jewelry business.

After defendant deposited $31,500 that he obtained from the Coursons into NII's bank account in September 1987, approximately $30,000 was taken from the account in less than a month by defendant or Stiffler. They also used funds from NII to vacation in Europe. Defendant and Stiffler apparently attempted to establish the formalities of a business by opening bank accounts in Urbana and Denver, Colorado, filing articles of incorporation in Colorado, and using an attorney to draft the investment agreement form and the articles of incorporation. However, the evidence demonstrated that NII's mailing addresses were nothing more than private mailboxes, that the IRS 1099 form was improper, and that numerous inconsistencies existed in the letters Mrs. Courson received from NII. Furthermore, no evidence existed that NII had an official business location, that it had attempted to respond to her demand for payment, or that it notified her of its demise. Thus, the jury could reasonably have found that these formalities were nothing more than a sham. In sum, we find that the evidence supporting defendant's intent to permanently deprive the Coursons of their money was not "so unreasonable, improbable, or unsatisfactory" as to create a reasonable doubt of defendant's guilt on the four counts of theft by deception. See *Campbell*, 146 Ill. 2d at 374-75, 586 N.E.2d at 1265-66.

## C. *Defendant's Pro Se Brief*

■ We also note that defendant's appellate counsel, the office of the State Appellate Defender (OSAD), filed a reply brief on defendant's behalf, and then defendant filed a *pro se* reply brief in this case. OSAD asks us to consider defendant's *pro se* brief along with its own, but we emphatically decline to do so. As at the trial level, a defendant has the right on appeal to proceed *either pro se or* through counsel (here, OSAD); he has no right to some sort of "hybrid representation," whereby he receives the services of appellate counsel and can still file his *pro se* briefs. (See *People v. Lighthall* (1988), 175 Ill. App. 3d 700, 704-05, 530 N.E.2d 81, 84.) The court in *Lighthall*, on its own motion, struck defendant's *pro se* brief from the record (*Lighthall*, 175 Ill. App. 3d at 705, 530 N.E.2d at 84), and we do the same here.

## D. *Attorney Hays' Testimony*

Defendant argues that the trial court erred in allowing certain testimony elicited during cross-examination and redirect examination of Hays, the attorney representing Mrs. Courson in the civil suit against defendant, Stiffler, and Holloway. Defendant states that despite his strenuous objection, the court allowed Hays to state his opinion regarding (1) the strength of the State's case, and (2) whether a crime had been committed. He contends that the court erred by allowing Hays, an attorney, to "[vouch] for the State's case and paralyze[ ] the jury's truthfinding process." The State responds that defendant's questioning invited Hays' responses during cross-examination and his comments during redirect examination.

During cross-examination, defense counsel questioned Hays as follows:

"Q. And you then persisted in trying to get both the State's Attorney of Piatt County and the United States District Attorney involved in prosecuting a criminal case, didn't you?

A. No. That's not accurate. I shared the information which I had with the State's Attorney of Piatt County.

Q. You shared the information? Okay. Did you encourage [him] to commence a criminal investigation?

A. I am sorry. I am not tracking with you. If after I returned, did I encourage him to commence a criminal investigation, the answer to that is no.

Q. Did you at any time encourage him to commence a criminal investigation?

A. I brought him the information that I had gathered in late January, which indicated to me that probable cause existed that criminal acts had been performed here and elsewhere, brought him that information, and we had—

[Defense Counsel]: Move to strike the answer as nonresponsive. I didn't ask for any legal determinations, and I simply asked if he encouraged the State's Attorney at any time to commence a criminal investigation.

THE COURT: The answer will stand as is, counsel.

\* \* \*

Q. Subsequent to your return, you [indicated that you wanted] to press the criminal investigation, is that correct?

A. I don't press criminal investigations. I shared information with the local authorities and other agencies at their request as I found it."

Subsequently, during redirect examination, the prosecutor questioned Hays as follows:

"Q. Now you shared information with my office and also with the U.S. District Attorney's office in Danville concerning this case?

A. That's correct.

Q. Why is that, Mr. Hays?

A. Because I believed that—

[Defense counsel]: Object, Your Honor. This is offering the same sort of conclusionary or opinion testimony.

THE COURT: No. He may answer the question.

A. Because I believed that evidence existed which would be (inaudible) in the criminal laws of the federal government as well as that of the State.

Q. Without using the lawyer terms, did you think a crime had been committed?

A. Yes under both federal and state law.

[Defense counsel]: Objection, Your Honor.

THE COURT: Overruled. The answer will stand.

Q. And as an attorney and officer of this court, did you feel like there was a duty on your part to report it to anyone in authority?

A. I believe that when an attorney finds evidence of the commission of a crime, unless he's prohibited from doing so by the canons of ethics and by his attorney client relationship, he has an absolute duty to report that to the public authority, just as every citizen does."

Defendant particularly contests Hays' statement during cross-examination that the information he had discovered during his investigation of this matter "indicated \*\*\* that *probable cause* existed that criminal acts had been performed" (emphasis added), and his response during redirect examination to the question whether he thought a crime had been committed of "Yes, under both federal and state law."

In general, evidentiary issues, such as the scope of cross-examination and redirect examination, that arise during criminal trials lie within the sound discretion of the trial court, and we will not reverse its decision absent a clear abuse of discretion (*People v. Patterson* (1992), 154 Ill. 2d 414, 463, 610 N.E.2d 16, 38; *People v. Kidd* (1992), 147 Ill. 2d 510, 535, 591 N.E.2d 431, 442; *People v. Crisp* (1992), 242 Ill. App. 3d 652, 658, 609 N.E.2d 740, 744). Further, if the defense opens the door to a subject during cross-examination, then the State can question the witness during redirect examination to explain or clarify matters raised or to remove unfavorable inferences or impressions created during cross-examination. (*People v. Bartee* (1991), 208 Ill. App. 3d 105, 110, 566 N.E.2d 855, 858.) The extent of this clarification or "rehabilitation" similarly lies within the sound discretion of the trial court. *Bartee*, 208 Ill. App. 3d at 110, 566 N.E.2d at 858.

Defendant concedes that he cannot support his argument with case law but asserts nonetheless that Hays' opinions as to the existence of "probable cause" and whether a crime had been committed amounted to a conclusion of fact, which only the jury is permitted to decide. Defendant analogizes Hays' testimony to expert testimony because of his status as an attorney and claims that opinion testimony from an expert cannot be given on the ultimate issue in the case if it is highly prejudicial, as defendant claims it was in this case. Essentially, defendant contends that Hays' status as an attorney caused the jury to give extra weight to his testimony, and therefore his opinions regarding defendant's guilt were highly prejudicial and amounted to reversible error.

■ We note that Hays made both comments at issue when explaining why he turned over the information he found during his investigation of defendant and NII—a matter about which defendant repeatedly challenged Hays. Hays' comments cannot be viewed in isolation, but must be considered within the context of his entire testimony. During cross-examination, defendant introduced the subject of why Hays contacted the State's Attorney and the United State's District Attorney, asking if Hays had encouraged either prosecutor to pursue criminal charges against defendant. Defendant asserts that Hays should have answered with only a "yes" or "no" response, rather than discussing if he thought probable cause existed. However, as shown above, Hays had answered this question twice with a "No"; when counsel asked a third time, Hays explained that he gave the information to these agencies because he thought "probable cause" existed that criminal acts may have been committed. Because this response revealed Hays' motive for sharing the information, it was relevant and responsive.

We find that the same holds true for Hays' comments during redirect examination. During cross-examination, defendant's line of questioning sought to portray Hays' motive for giving the information to these agencies to be an attempt to gain an advantage over defendant in Mrs. Courson's civil action by pushing a criminal investigation and prosecution of defendant. On redirect examination, the State asked Hays to clarify his reasons for turning over the information of defendant's and NII's activities. Thus, the State was attempting to rehabilitate Hays during redirect examination concerning matters which defendant brought out during cross-examination. Defendant opened this door and must accept Hays' rehabilitating testimony on redirect examination which clarified his answers. (See *Bartee*, 208 Ill. App. 3d at 110, 566 N.E.2d at 858.) In order to avoid the damaging effect of this rehabilitating testimony, defendant's better trial practice would have been to avoid "dirtying up" Hays by suggesting improper motives. Then the rehabilitating testimony would not have been admissible.

Furthermore, as the State points out, neither of Hays' comments was offered to prove that defendant actually committed the offenses charged. Additionally, defendant's claim that the jury gave extra weight to Hays' testimony is nothing more than speculation. We note that Hays was called and examined like any other witness, and that the State did not emphasize his status as an attorney. In sum, we find nothing in the record to support defendant's claim that the trial court erred in its rulings regarding Hays' testimony. We hold that the court did not abuse its discretion when ruling on these evidentiary issues or determining the proper scope of cross-examination or redirect examination of Hays.

### E. *Sentencing*

#### 1. Evidence Presented at the Sentencing Hearing

Defendant next argues that the trial court improperly imposed consecutive, extended-term sentences totaling 16 years in prison. He claims that when imposing sentence, the court considered unreliable information regarding the possibility that he murdered his deceased wife, Tina (Mrs. Courson's daughter), or that he was involved in the murder of one of Stiffler's business associates. Defendant notes that Hays testified at defendant's bond hearing and preliminary hearing regarding the possibility that defendant had murdered Tina when they were vacationing in Utah. (Tina fell to her death while hiking in the mountains with defendant and Stiffler.) Defendant also notes that the State presented evidence at the bond hearing regarding the possibility of defendant's involvement in Tina's death—particularly, evidence of a travel life insurance policy defendant purchased on Tina effective during their three-week vacation in Europe and Utah.

Additionally, defendant points out that during his second interview on October 11, 1989, conducted by the Piatt County State's Attorney, Hays, and Manint, Hays asked questions which implied that defendant was involved in Tina's death and possibly aided in the murder of Stiffler's business associate, who had been shot in the head in Utah in 1988. The trial court granted defendant's motion to suppress this interview at defendant's trial; nevertheless, defendant states that through these proceedings, the court was further made aware of these accusations. Defendant contends that all this unreliable and unsubstantiated discussion of his possible involvement in these deaths caused the trial court to impermissibly consider it as a factor in aggravation when the court imposed both an extended-term sentence and consecutive sentences.

The trial court is in the best position to make a reasoned decision as to the appropriate punishment in each case, and this court will not reverse a sentence imposed by the trial court which falls within the statutory guidelines unless the trial court has abused its discretion when making that decision. (*People v. Streit* (1991), 142 Ill. 2d 13, 19, 566 N.E.2d 1351, 1353; *People v. King* (1993), 248 Ill. App. 3d 180, 187, 618 N.E.2d 1051, 1057.) The trial court enjoys wide latitude in determining and weighing factors in mitigation or aggravation, and this court gives great deference and weight to the sentence the trial court thought appropriate in any given case. *People v. White* (1992), 237 Ill. App. 3d 967, 969, 605 N.E.2d 720, 721-22.

At defendant's sentencing hearing, the trial court made the following comments when imposing defendant's sentence:

> "*First of all, there indeed was no physical harm to anyone, at least under the counts charged.* There is no evidence that the defendant acted under a strong provocation to commit his offense. There were no substantial grounds tending to excuse, or justify his criminal conduct. This criminal conduct was not induced or facilitated by someone other than the defendant with the exception of maybe Eddie Stiffler. Mr. Stiffler, as the evidence indicated, may have been a part of this activity.
>
> *The defendant has not compensated Mrs. Courson and her deceased husband, even though he obtained four hundred five thousand dollars out of his wife's death through insurance policies.* The character and attitude of the defendant do not indicate to this court that he will not commit a like offense. The evidence indicates otherwise. The imprisonment of the defendant would not entail excessive hardship to the defendant or—apparently he's remarried. Imprisonment would not endanger his medical condition.
>
> A plus side is the defendant does not have a history of prior de-

linquency or criminal activity. [However,] the defendant did utilize his trust that he established with the Coursons in order to obtain these funds. The court believes that a penitentiary sentence is necessary, definitely, to deter others from committing the same type of offense. The court believes that having a due regard to the character of the offender and the nature and circumstance of the offense, and that the public interests find that a sentence of imprisonment is the most appropriate disposition to this defendant.

The defendant also should be sentenced to an extended term in the penitentiary. He has met the criteria of committing an offense against Mrs. Courson, who was around seventy years of age at the time, and I believe that her husband was bedridden and disabled at the time, and part of these—I think half of these funds belonged to Mrs. Courson's deceased husband.

The court hereby sentences the defendant to an extended term of eight years in Counts I, II, III, and IV. *The court also notes as did the State, that there have been a number of victims, and the court wishes to state for the record that it is going to sentence the defendant only for the offenses committed under the offenses charged.* Dorothy Courson and her husband were definite victims; *Tina Courson, defendant's deceased wife;* Mr. McClellan, defendant's counsel; apparently the defendant's mother[,] who also invested in Network International, Inc.[,] and supplied the funds to her son to be released from jail and obviously she is going to be deprived of those funds. What the defendant did is an outrage to the community, and absolutely reprehensible.

*Some of the funds taken from Mr. and Mrs. Courson may or may not have been used for the vacation of the defendant and Tina. The court notes that through People's Exhibit Number 1, under the trip insurance, the departure date was May the 1st, 1987. The return date was May the 18th, 1987. The trip or vacation consisted of a tour around Europe. The final leg of the trip apparently was in the United States, the probation officer's report states in the State of Utah, where the defendant and Tina were hiking and apparently she fell to her death at that time. The defendant sent his notice of claim to the insurance company on May the 20th, two days after the death, and I think one day prior to Tina's funeral, and he indeed was paid the sum of one hundred fifty thousand dollars for Tina's death and collected a total of four hundred and five thousand dollars due to her death.*

The money obtained from Mr. and Mrs. Courson was obtained over a period of around eight months. The first moneys received on August 31, 1986, the second on September the 8th, 1986, the third on March the first, 1987, the fourth on April 15, 1987.

There is no doubt in this court's mind that the public must be protected from the likes of the defendant. The court believes that the four separate instances were not part of a continuing transaction. There were distinct, different business dealings and as stated, the court does not believe that it is a part of a single transaction." (Emphasis added.)

Defendant specifically points to the portions of the trial court's discussion emphasized above as evidence that the court considered the possibility of his involvement in the two deaths when imposing extended-term, consecutive sentences upon him. Defendant concludes that the only possible explanation for his receiving a total of 16 years in prison when he was a first-time offender and an Air Force veteran is that the trial court considered impermissible evidence. The State responds that the trial court stated it would not consider evidence of these other uncharged offenses, and thus its sentence should be presumed to have been based only on proper evidence. (See *People v. Phillips* (1989), 127 Ill. 2d 499, 537, 538 N.E.2d 500, 516.) Because defendant's sentence was within the statutory guidelines, the State concludes that the trial court did not abuse its discretion.

■ Under section 5—5—3.2(b)(3) of the Unified Code of Corrections (Unified Code) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(3)), the trial court can impose an extended-term sentence when the victim of defendant's felony convictions is over 60 years of age or physically handicapped. "Physically handicapped" includes a permanent and disabling physical characteristic resulting from disease or a congenital condition that impairs the ability of a person to avoid or prevent the commission of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(3).) Under section 5—8—4(b) of the Unified Code (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b)), the court can impose consecutive sentences if it believes that a consecutive term is required to protect the public from further criminal conduct.

As shown above, the trial court found that all three of these conditions were met. Mrs. Courson was approximately 70 years of age, and her husband was "physically handicapped" because he was bedridden with cancer. The court also noted that the public should be protected "from the likes of the defendant" because of his character and because the circumstances surrounding these offenses do not indicate that he would not commit similar offenses again. In our judgment, neither finding constitutes an abuse of discretion. Therefore, based on these findings, the sentences imposed on defendant were within the appropriate statutory guidelines.

Despite the trial court's specifically stating that it "was going to sentence defendant only for the offenses committed under the offen-

ses charged," defendant claims that the court's other comments clearly show that it considered the evidence of the uncharged offenses. We disagree. The court's comments above, particularly its discussion of the European vacation that extended into the United States, reveal the extravagance of defendant's use of the Coursons' money and point out that defendant had received funds enabling him to repay the Coursons but had failed to do so. Defendant's arguments amount to no more than speculation that the court did not mean what it said. Based upon our review of the record, we conclude that defendant has not overcome the presumption that the trial court considered only proper evidence when sentencing him. See *People v. Ward* (1992), 154 Ill. 2d 272, 334-35, 609 N.E.2d 252, 279; *People v. Hampton* (1992), 149 Ill. 2d 71, 94, 594 N.E.2d 291, 302.

Additionally, we reaffirm what we recently wrote about defendants who take advantage of victims over 60 years of age: " 'If our elderly citizens are to be protected from con artists like this defendant, harsh sentences ought to be imposed upon criminals who prey upon the elderly. By imposing such sentences, the courts may deter similar crimes from being committed.' " (*People v. Gramo* (1993), 251 Ill. App. 3d 958, 970, 623 N.E.2d 926, 935, quoting *People v. Lambert* (1990), 195 Ill. App. 3d 314, 332, 552 N.E.2d 300, 312.) We note that deterrence, a legitimate concern when determining an appropriate sentence, possesses its greatest legitimacy when, as in this case, a defendant receives a lengthy sentence for engaging in an involved, calculating scheme to bilk the elderly. Therefore, we find that defendant's sentences were certainly appropriate in this case, and we hold that the trial court did not abuse its discretion by sentencing defendant to consecutive, extended-term sentences totaling 16 years in prison.

## 2. Consecutive Sentences

Defendant next argues that the trial court improperly imposed consecutive sentences because the four offenses for which he was sentenced were committed in a "single course of conduct." Relying on Justice Heiple's dissent in *People v. Bole* (1993), 155 Ill. 2d 188, 200, 613 N.E.2d 740, 746, defendant contends that his motivation for each of these offenses never changed despite his taking of the Coursons' money over an extended period, and thus his offenses were committed in a single course of conduct.

Defendant's argument relies on section 5—8—4(a) of the Unified Code (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(a)), which states that "[t]he court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during

which there was no substantial change in the nature of the criminal objective." Section 5—8—4(b) of the Unified Code (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b)) provides that a consecutive sentence could be imposed if "the nature and circumstances of the offense and the history and character of the defendant [demonstrate that] such a term is required to protect the public from further criminal conduct by the defendant." However, if section 5—8—4(a) of the Unified Code prohibits consecutive sentences, then the trial court cannot impose consecutive sentences under section 5—8—4(b) of the Unified Code. *People v. Fritz* (1992), 225 Ill. App. 3d 624, 628, 588 N.E.2d 307, 310.

■ Based upon our review of the record, we agree with the trial court's findings at defendant's sentencing hearing that the agreements made between defendant and the Coursons "were distinct, different business dealings and *** [not] a part of a single transaction." Furthermore, we agree with the State that (1) defendant committed each offense "at a different time and under different circumstances," (2) the criminal objective for each offense was satisfied once Mrs. Courson tendered defendant a check, and (3) defendant's criminal objective for the next offense was formed only after he had completed the first offense. (See *Fritz*, 225 Ill. App. 3d at 629, 588 N.E.2d at 311; *McManus*, 197 Ill. App. 3d at 1100-01, 555 N.E.2d at 402.) Accordingly, we conclude that the trial court correctly found that defendant's four convictions of theft by deception were separate acts, and that the court did not improperly impose consecutive sentences under section 5—8—4(b) of the Unified Code.

### 3. Restitution

Defendant last argues that the trial court erred in entering a restitution order. At defendant's November 1992 sentencing hearing, the court ordered him to pay restitution for the remaining $18,349.49 from the original $45,500 restitution order. Defendant notes that he will serve at least eight years under his current sentence and that he will not be able to make any payments while in prison. Thus, he claims that by the time he is released, the statutory period for making restitution will have expired; therefore, ordering him to make any further restitution is unnecessary and improper. The State, citing this court's decision in *People v. Mitchell* (1993), 241 Ill. App. 3d 1094, 610 N.E.2d 794, responds that the trial court's restitution order was proper.

The trial court can order restitution as part of its sentencing order alone or in conjunction with a term of imprisonment. (*Mitchell*, 241 Ill. App. 3d at 1097, 610 N.E.2d at 797; *People v. Wiesneske* (1992), 234 Ill. App. 3d 29, 47, 599 N.E.2d 1266, 1277; Ill. Rev. Stat. 1985, ch.

38, par. 1005—5—6.) An order of restitution can extend up to, but not exceed, a period of five years (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—6(f)), and this five-year period may commence at any time prior to or upon defendant's release from prison (*People v. Brooks* (1994), 158 Ill. 2d 260, 272).

■ In *Mitchell*, the defendant also argued that his restitution order was meaningless because he had no assets and would not be able to comply with it. He asked this court to vacate the order, but we held that "the trial court has the authority to order restitution as a part of the sentence, regardless of the term of the incarceration and defendant's financial resources." (*Mitchell*, 241 Ill. App. 3d at 1098, 610 N.E.2d at 797.) We noted that no provision exists in section 5—5—6 of the Unified Code (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—6) which requires consideration of a defendant's ability to pay when the trial court decides whether restitution should be included in the sentence; thus, a defendant's apparent lack of ability to pay does not invalidate a restitution order. (*Mitchell*, 241 Ill. App. 3d at 1097-98, 610 N.E.2d at 797 (defendant's compliance with a restitution order may be unlikely; nevertheless, the victim will be able to recover the lost funds should defendant obtain money in the future, such as by inheritance).) In this case, defendant presents essentially the same argument presented by the defendant in *Mitchell*, and he provides no compelling reasons why we should not follow *Mitchell*. Therefore, we reaffirm our holding in *Mitchell* and hold that the trial court's restitution order was proper.

## III. CONCLUSION

For the reasons stated, we affirm defendant's convictions on all four counts of theft by deception and the trial court's imposition of consecutive, extended-term sentences and an order of restitution upon defendant.

Affirmed.

KNECHT and GREEN, JJ., concur.